569 S.E.2d 162

**William Wayne REPASS, Appellant,**

v.

**WORKERS' COMPENSATION DIVISION and USX Corporation/U.S. Steel Mining Company, Inc. Appellees.**

and

**Randall Z. Bower, Appellant,**

v.

**Workers' Compensation Division and Maple Meadow Mining Company, Appellees.**

Nos. 27730, 28392.

Supreme Court of Appeals of West Virginia.

Submitted Feb. 19, 2002.

Decided June 28, 2002.

Dissenting Opinion of Chief Justice Davis July 17, 2002.

---

S.F. Raymond Smith, Esq., Rundle & Rundle, Pineville, for Appellant Repass.

Don M. Stacy, Esq., Reginald D. Henry, Esq., Beckley, for Appellant Bower.

Darrell V. McGraw, Jr., Attorney General, Sandra Keech, Assistant Attorney General, Charleston, for Appellee Workers' Compensation Division.

Howard G. Salisbury, Esq., Kay, Casto & Chaney, PLLC, Charleston, for Appellee USX Corporation/U. S. Steel Mining Company.

John W. Woods, III, Esq., Tracy L. Webb, Esq., Bowles Rice McDavid Graff & Love, Charleston, for Appellee Maple Meadow Mining Company.

Timothy J. Huffman, Esq., John L. McClaugherty, Esq., Jackson & Kelly, Charleston, for Amicus Curiae West Virginia Chamber of Commerce.

Sue Anne Howard, Esq., Wheeling, for Amici Curiae West Virginia Trial Lawyers Association and West Virginia AFL–CIO.

William D. Turner, Esq., Crandall, Pyles, Haviland & Turner, LLP, Lewisburg, for Amicus Curiae West Virginia Trial Lawyers Association.

Thomas P. Maroney, Esquire, Charleston, for Amicus Curiae West Virginia AFL–CIO.

McGRAW, Justice.

Two workers' compensation claimants who suffered back injuries disagreed with the initial disability ratings granted them by the Workers' Compensation Division and appealed. In each case, the Office of Judges found that examinations conducted under one examination model were unreliable, and granted the claimants higher disability ratings. The employer in each case appealed, and the Workers' Compensation Appeal Board found the questioned method of examination to be valid, and reinstated the original awards granted by the Workers' Compensation Division. The claimants appeal, arguing that the Office of Judges was correct in disregarding the questioned examination model because it is in conflict with our law. Because we concur with the logic of the Office of Judges, we reverse.

## I.

### BACKGROUND

Today we examine two cases, which we consolidated because they concern the same questions of law. Both cases concern the use of a particular diagnostic method, or "model," for the evaluation of injuries to the spine. One method, the Range of Motion Model, or ROM, measures, as the name implies, the patient's range of motion across several specific movements. The doctor then compares these ranges against presumed normal ranges for uninjured individuals. Doctors using the other method, the Diagnostic–Related Estimate Model, or DRE, examine a patient's injury or symptoms and then assign the patient to one of eight categories, or "pigeon holes," based on those particular symptoms.

Both models are found in the American Medical Association's *Guides to the Evaluation of Permanent Impairment, Fourth Edition* (1993). Rules promulgated by the Workers' Compensation Commissioner command doctors to conduct their examinations and prepare their reports in accordance with this publication when examining patients for permanent partial disability.[1] The two models often produce very different impairment ratings, with the DRE usually producing a lower percentage of impairment, and the ROM producing a higher percentage of impairment; each model has its supports and detractors. However, the fourth edition of the

---

1. Once the doctor has determined an impairment rating for a claimant, the Division, if it agrees, grants the claimant a disability rating. We dis-

cuss the relationship between impairment and disability below.

*Guides* demands that the DRE Model be used in most circumstances unless a doctor can show some special reason why that model should not be used.

Because of concerns about the DRE Model, discussed at greater length *infra*, the Workers' Compensation Office of Judges deemed DRE-based examinations "unreliable" in late 1997. However, the Workers' Compensation Appeal Board continued to accept DRE-based examinations. The two appellants in this case both received lower ratings under the DRE Model and higher ratings under the ROM Model. Each appealed a decision of the Workers' Compensation Division to the Office of Judges, where each prevailed. Then, each of them had that favorable decision reversed by the Workers' Compensation Appeal Board, and subsequently appealed that adverse decision to this Court. For the reasons set forth below, we find that examinations performed under the DRE are invalid and unreliable, and reverse the decisions of the Appeal Board.

### A.

### *Repass v. WCD and U.S. Steel Mining Co., Inc.*

William R. Repass suffered an injury to his lower back on June 29, 1992 while working for his employer, U.S. Steel Mining Company. Mr. Repass filed a claim, and some time later the West Virginia Workers' Compensation Division (the "Division") referred Mr. Repass to a Dr. Landis for an evaluation to determine his degree of permanent partial disability, if any. During an examination based upon the DRE Model conducted on October 30, 1996, Dr. Landis found evidence of a healed fracture of one of Mr. Repass' lumbar vertebrae, and a full range of motion of the lumbar spine. Dr. Landis concluded that Mr. Repass had reached maximum medical improvement, and that he suffered a 5 percent impairment as result of the June 29, 1992 injury. Upon receipt of Dr. Landis' evaluation, the Division awarded Mr. Repass an award for a 5 percent permanent partial disability.

Mr. Repass protested the Division's award and submitted an evaluation report conducted by a Dr. Carlson on August 1, 1997. Dr. Carlson examined Mr. Repass using the ROM Model and concluded that Mr. Repass suffered a 9 percent impairment, specifically, 5 percent for the fracture and 4 percent for limitation of flexion in his back. Thereafter, Mr. Repass' employer, U.S. Steel Mining Company, had yet another doctor examine Mr. Repass. Dr. Paul Bachwitt examined Mr. Repass on October 14, 1997, and his report referenced both the DRE and ROM methods, but apparently the doctor claimed that the ROM findings were not credible and that the ROM method should not be used. Under the DRE method, Dr. Bachwitt, in agreement with the report of Dr. Landis, found that Mr. Repass should be granted a 5 percent award.

The Workers' Compensation Office of Judges considered Mr. Repass' appeal and on March 11, 1998, issued a decision reversing the Division's prior award of 5 percent, and granting Mr. Repass a 9 percent award based on Dr. Carlson's findings. In reaching this conclusion, the administrative law judge referenced an earlier opinion of the Office of Judges, known as the *Cottrell* decision of August 1997,[2] in which the chief administrative law judge had determined that examinations conducted using the DRE were unreliable. U.S. Steel Mining Company appealed, and on September 30, 1998, the Workers' Compensation Appeal Board reversed and reinstated the initial 5 percent award for permanent partial disability granted by the Division. Mr. Repass now challenges the Appeal Board's final decision.

### B.

### *Bower v. WCD and Maple Meadow Mining Company*

Mr. Randall Z. Bower suffered two separate injuries to his back, one on October 3, 1994, and one about two years later on July

2. The decision in question was that of *Thelma M. Cottrell,* Claim No. 92–66811, August 22, 1997, which we discuss in greater detail below.

16, 1996. Also, while Mr. Bower was in the midst of his examinations for these injuries, the Office of Judges released the *Cottrell* decision and accompanying policy memorandum, which necessitated even more examinations. Accordingly, Mr. Bower's examination history is quite complicated, and the briefs actually contain a chart that sets forth the doctors who examined him and their corresponding findings.

No fewer than eight doctors examined Mr. Bower between January 1996 and December 1998, using either the DRE Model, the ROM Model, or both, and giving him impairment ratings from 4 percent to 16 percent. By April 22, 1997, the Division had made awards for a total of 5 percent permanent partial disability. After the issuance of *Cottrell* and a flurry of additional examinations, the Office of Judges reversed the Division and granted Mr. Bower a disability rating of. 16 percent. The Office of Judges apparently disregarded any examination based upon the DRE and applied the liberality rule, basing the award upon the highest impairment rating found under the ROM Model. The employer appealed, and on June 29, 2000, the Appeal Board reversed and reinstated the earlier award by the Division of a 5 percent permanent partial disability. Mr. Bower now asks this Court to reverse the Appeal Board's June 29, 2000 decision.

## II.

### STANDARD OF REVIEW

If considering a question of fact, "[i]n most cases we show substantial deference to the factual findings of the Workers' Compensation Appeal Board." *Plummer v. Workers' Compensation Division*, 209 W.Va. 710, 712, 551 S.E.2d 46, 48 (2001). However, when considering a question of law, as we are in the instant matter, our standard differs: "[w]hile the findings of fact of the appeal board are conclusive unless they are manifestly against the weight of the evidence, the legal conclusions of the appeal board, based upon such findings, are subject to review by the courts." *Barnett v. State Workmen's Compensation Com'r.*, 153 W.Va. 796, 812, 172 S.E.2d 698, 707 (1970) (quoting *Emmel v. State Compensation Director*, 150 W.Va. 277,

145 S.E.2d 29 (1965)). We must also bear in mind that: "When the Workers' Compensation Appeal Board reviews a ruling from the Workers' Compensation Office of Judges it must do so under the standard of review set out in W. Va.Code § 23–5–12(b) (1995), and failure to do so will be reversible error." Syl. pt. 6, *Conley v. Workers' Compensation Div.*, 199 W.Va. 196, 483 S.E.2d 542 (1997). That Code section provides that the Appeal Board may only reverse the Office of Judges when the judge's findings are in violation of statute, in excess of the judge's statutory authority, made upon unlawful procedure, or affected by some error of law. The Appeal Board must also reverse if the administrative law judge's decision is clearly wrong, or arbitrary, capricious or characterized by abuse of discretion. W. Va.Code § 23–5–12(b) (1995).

## III.

### DISCUSSION

#### A. *Liberality*

Though often stated by the Court, it bears repeating that we look to one polar star for guidance in any workers' compensation case. " 'The Workmen's Compensation Law is remedial in its nature, and must be given a liberal construction to accomplish the purpose intended.' Syl. pt. 3, *McVey v. Chesapeake & Potomac Telephone Co.*, 103 W.Va. 519, 138 S.E. 97 (1927) (citation omitted)." Syl. pt. 1, *Plummer v. Workers' Compensation Division*, 209 W.Va. 710, 551 S.E.2d 46 (2001). The West Virginia Workers' Compensation system exists to the benefit of both employers and employees, freeing employers from lawsuits for simple negligence while ensuring employees compensation for their work-related injuries.

The Act is designed to compensate injured workers as speedily and expeditiously as possible in order that injured workers and those who depend upon them for support shall not be left destitute during a period of disability. The benefits of this system accrue both to the employer, who is relieved from common-law tort liability for negligently inflicted injuries, and to the

employee, who is assured prompt payment of benefits.

*Meadows v. Lewis*, 172 W.Va. 457, 469, 307 S.E.2d 625, 638 (1983). In restating this principle, we are not unmindful of the perception that our system makes our state less attractive to some businesses. But it is for the Legislature, not the Commissioner, or the courts, to make the difficult and sometimes unpopular decisions necessary to fund the system or limit its expenses. The Commissioner must follow the commands of the Legislature as expressed by statute. In the absence of express statutory authority, it is not the Commissioner's duty to take major steps to limit compensation to deserving workers, or design systems that make recovery less likely. Indeed:

"[The Workers' Compensation Act] requir[es] the state compensation commissioner in administering the workmen's compensation fund, to ascertain the substantial rights of the claimants in such manner as will carry out justly and liberally the spirit of the act, unrestricted by technical and formal rules of procedure . . . ." Syllabus, in part, *Culurides v. Ott*, 78 W.Va. 696, 90 S.E. 270 (1916) (citation omitted);

*Martin v. Workers Compensation Div.*, 210 W.Va. 270, 275, 557 S.E.2d 324, 329 (2001) (quoting syl. pt. 2, *Plummer v. Workers' Compensation Division*, 209 W.Va. 710, 551 S.E.2d 46 (2001)). This does not mean that any person claiming an injury should instantly be awarded the maximum possible compensation. We recognize that workers' compensation is not the equivalent of a welfare system.[3] The command of the law that the workers' compensation process be "unrestricted by technical and formal rules of procedure" means that, if the statutes would provide a worker with compensation, the Commissioner cannot create barriers or hurdles that would prevent that recovery. If the system is not producing the desired results, then the Legislature can change the statute, and in so doing craft a solution suitable to a majority of the electorate. We recognize that the ultimate responsibility for the fiscal health of the West Virginia Workers' Compensation system rests with the Legislature. Balancing the conflicting goals of minimizing premiums while providing full and fair compensation to injured workers is the exclusive province of our publicly-elected legislators, and is not to be invaded by the Commissioner, or the Courts.

■ And so bearing in mind that "although the rules and regulations governing the workers' compensation system in this state are necessarily detailed and complex, we must be careful to prevent those deserving of compensation from being thwarted by technicalities or procedural niceties," *Martin v. Workers Compensation Div.*, 210 W.Va. 270, 275, 557 S.E.2d 324, 329 (2001), we turn to an examination of the instant dispute.

### B. *Why the Guides are at issue*

This case turns upon the propriety of the Commissioner's adoption of what the parties refer to as "the *Guides*," as the standard by which permanent impairment shall be determined. The full name of this publication is, The American Medical Association's *Guides*

3. As law professor and former Compensation Commissioner Emily Spieler noted:

Part of the problem with workers' compensation legislation is the apparent confusion over this very issue. Ask any legislator to think about a hard-working person s/he knows who was injured on the job: the legislator will insist to you that the person, perhaps a neighbor, deserves our help, our trust, and adequate benefits from the workers' compensation program. On the other hand, the image of injured workers which often emerges in political discussions is tainted by the perception that workers' compensation is just another welfare program: that people (that is, injured workers) get something for nothing; that the system encourages idleness, fraud, and other socially unwanted and expensive behaviors. The focus then becomes how to limit benefits in order to reduce any economic incentive for workers to behave badly (at best) or fraudulently (at worst). The image of the legitimately injured worker in need of help fades from the discussion. This turns out to be politically useful, since the limitation on benefits not only discourages this apparently anti-social behavior of workers; it also results in the desired cost-savings for businesses, establishing fiscal stability without significant premium increases. Emily A. Spieler, *Assessing Fairness in Workers' Compensation Reform: A Commentary on the 1995 West Virginia Workers' Compensation Legislation*, 98 W. Va. L.Rev. 23, 131 (1995) (footnotes omitted).

to the *Evaluation of Permanent Impairment, Fourth Edition,* and we shall refer to it simply as, *"Guides, Fourth"* in the text of this opinion, so that it is not confused with earlier or later editions of the same publication.[4] The *Guides, Fourth* are at issue in this case by virtue of the Legislature's delegation of authority to the Commissioner, and a rule issued by the Commissioner adopting the *Guides, Fourth* for certain purposes.

Before addressing the application of this publication to examinations of spinal injuries, we first explain how it is that this publication is at issue in the cases below. As we have discussed in previous cases, the Legislature made significant changes to the workers' compensation system in 1995.

On February 10, 1995, the West Virginia Legislature passed and enacted Committee Substitute for Senate Bill 250, which comprehensively revised numerous aspects of West Virginia workers' compensation law. The purported goal of these sweeping reforms envisioned ameliorating the workers' compensation fund's fiscal crisis and restoring its financial integrity. See *State ex rel. Blankenship v. Richardson,* 196 W.Va. 726, 729–31, 474 S.E.2d 906, 909–11 (1996).

*State ex rel. ACF Industries, Inc. v. Vieweg,* 204 W.Va. 525, 529, 514 S.E.2d 176, 180 (1999) (footnote omitted). Of specific importance to this case is that the Legislature altered the way in which one discovers the extent of an injured worker's permanent partial disability; under current law, one determines the level of permanent disability by first finding the worker's degree of whole body medical impairment. The Legislature also granted the Commissioner authority to establish standards for the determination of that impairment:

> [T]he degree of permanent disability other than permanent total disability shall be determined exclusively by the degree of whole body medical impairment that a claimant has suffered.... The workers' compensation division shall adopt standards for the evaluation of claimants and the determination of a claimant's degree of whole body medical impairment. Once the degree of medical impairment has been determined, that degree of impairment shall be the degree of permanent partial disability that shall be awarded to the claimant.

W. Va.Code § 23–4–6(i) (1999).[5] Of course the ultimate question being asked is, "how much, if any do we (the State) owe the injured worker?" Before 1995, our system took into account factors beyond medical impairment when making a determination about permanent partial disability. As Justice Starcher explained in a concurring opinion,

> Prior to the Legislature's amendments in 1995, the Workers' Compensation Act distinguished between impairment, which is a

---

4. Although the *Guides, Fourth* is one publication and therefore singular, we refer to it as though it were plural, so as to avoid awkward sentence construction and because we recognize that practitioners in this field also refer to the *Guides, Fourth* in the plural.

5. W. Va.Code § 23–4–6(i) (1999) states:

(i) For the purposes of this chapter, with the exception of those injuries provided for in subdivision (f) of this section and in section six-b of this article, the degree of permanent disability other than permanent total disability shall be determined exclusively by the degree of whole body medical impairment that a claimant has suffered. For those injuries provided for in subdivision (f) of this section and section six-b of this article, the degree of disability shall be determined exclusively by the provisions of said subdivision and said section. The occupational pneumoconiosis board created pursuant to section eight-a of this article shall premise its decisions on the degree of pulmonary function impairment that claimants suffer solely upon whole body medical impairment. The workers' compensation division shall adopt standards for the evaluation of claimants and the determination of a claimant's degree of whole body medical impairment. Once the degree of medical impairment has been determined, that degree of impairment shall be the degree of permanent partial disability that shall be awarded to the claimant. This subdivision shall be applicable to all injuries incurred and diseases with a date of last exposure on or after the second day of February, one thousand nine hundred ninety-five, to all applications for an award of permanent partial disability made on and after such date, and to all applications for an award of permanent partial disability that were pending before the division or pending in litigation but not yet submitted for decision on and after such date. The prior provisions of this subdivision shall remain in effect for all other claims.

medical question, and disability, which is a legal question. To determine impairment, a doctor would examine the claimant and render a scientific opinion regarding how much a claimant's physical functions were impaired by a work-related injury. The Workers' Compensation Commissioner would then determine disability by looking at the doctor's opinion on impairment, and mix that opinion with the evidence of the claimant's earning capacity, the effect of the impairment on the claimant's efficiency at work, and the effect of the impairment on the claimant's pursuit of normal everyday living. From a mix of these factors, the Commissioner would compute the claimant's percentage of permanent partial disability. The Commissioner's permanent partial disability award would, in theory, only partially take into account the doctor's determination of impairment.

In 1995 the Legislature amended W. Va.Code, 23–4–6(i) to state that "the degree of permanent disability other than permanent total disability shall be determined exclusively by the degree of whole body medical impairment that a claimant has suffered." This amendment altered the Workers' Compensation Act in two ways significant to this case. First, after 1995 doctors are to make impairment evaluations using a standardized, "whole body" impairment rating system—in other words, they are to use the American Medical Association's *Guides to the Evaluation of Permanent Impairment, Fourth Edition* (1993). Second, the Commissioner is to make permanent partial disability awards solely on the basis of the doctor's impairment evaluation. Put another way, the percentage of medical impairment now equals the percentage of permanent partial disability, and the Commissioner cannot take into consideration any other factors.

*Wagner v. Workers' Compensation Div.*, 205 W.Va. 186, 191–92, 517 S.E.2d 283, 288–89 (1998) (per curiam) (Starcher J., concurring) (footnote omitted).

Moreover, the Commissioner has equated an impairment rating conducted under this standard to be the equivalent of a disability rating for permanent impairment. The au-

thors of *The Guides* themselves urge against any system that equates medical impairment with disability. As we noted in a case challenging the constitutionality of the 1995 changes:

> See 85 CSR 16–3.4 (defining "permanent impairment" and "impairment," according to the Guides, and indicating that "[a] claimant's degree of permanent whole body medical impairment is to be determined in keeping with the determination of whole person permanent impairment as set forth in the Guides." *Id.*, in relevant part.)

The exclusive use of the Guides for evaluation of impairment and, therefore, permanent partial disability, is not recommended by its author:

> "The critical problem is that no formula is known by which knowledge about a medical condition can be combined with knowledge about other factors to calculate the percentage by which the employee's industrial use of the body is impaired. Accordingly, each commissioner or hearing official must come to a conclusion on the basis of assessment of the available medical and nonmedical information. The Guides may help resolve such a situation, but it cannot provide complete and definitive answers. Each administrative or legal system that uses permanent impairment as a basis for disability ratings should define its own means for translating knowledge about an impairment into an estimate of the degree to which the impairment limits the individual's capacity to meet personal, social, occupational, and other demands or to meet statutory requirements.
>
> **It must be emphasized and clearly understood that impairment percentages derived according to Guides criteria should not be used to make direct financial awards or direct estimates of disabilities."**
>
> *Id.* at 1/4–1/5 (bold provided [in text of *Guides* ] ).

In light of the AMA's admonition against the exclusive use of its Guides for evaluation of permanent disability, we question the Commissioner's wisdom in adopting them.

*State ex rel. Blankenship v. Richardson,* 196 W.Va. 726, 735–36, n. 13, 474 S.E.2d 906, 915–16, n. 13 (1996) (quoting *Guides, Fourth,* emphasis in original). While we still have our concerns about a system that makes a one-to-one correlation between impairment and disability, and while we continue to question the wisdom of employing the *Guides, Fourth* in a fashion contrary to the intent of the authors, neither issue is squarely before the Court today. What is before the Court, is whether the adoption of the *Guides, Fourth* as a mandatory set of instructions for performing an examination of a claimant with a spinal injury is consistent with our workers' compensation law.

Pursuant to the W. Va.Code § 23–4–6(i) (1999), the Division [6] issued a rule that established standards for determining an injured worker's degree of permanent impairment:

§ 85–16–4. **Adoption of Standards.**

4.1. Except as provided for in section 6 of this rule, on and after the effective date of this rule all evaluations, examinations, reports, and opinions with regard to the degree of permanent whole body medical impairment which a claimant has suffered *shall be conducted and composed in accordance with the "Guides to the Evaluation of Permanent Impairment," (4th ed.1993), as published by the American Medical Association.* If in any particular claim, the examiner is of the opinion that the Guides or the section 6 substitutes cannot be appropriately applied or that an impairment guide established by a recognized medical speciality group may be more ap-

propriately applied, then the examiner's report must document and explain the basis for that opinion. Deviations from the requirements of the Guides or the section 6 substitutes shall not be the basis for excluding evidence from consideration. Rather, in any such instance such deviations shall be considered in determining the weight that will be given to that evidence. An example of an acceptable recognized medical speciality group's own guides is the "Orthopaedic Surgeons Manual in Evaluating Permanent Physical Impairment."

85 C.S.R. § 85–16–4(1996)(emphasis added) [7].

We find it extremely important to note that the rule commands a doctor to conduct the examination and compose the report "in accordance with the guides" and not simply to use the models or suggestions contained in the publication. Indeed, the basis of the appellees' argument is that, minus the exceptions specified in the rule, the whole of the *Guides, Fourth,* including the DRE section, *must* be followed by any doctor performing an examination on a claimant. As a result of this phrasing, the Division has essentially incorporated by reference into the rule, the entirety of the *Guides, Fourth.* While the publication runs some three hundred pages and encompasses all aspects of impairment of many bodily systems, we are concerned in this case with injuries of the spine. In the section dealing with spinal injuries, the *Guides, Fourth* describes two methods of determining impairment. One is called the

---

**6.** W. Va.Code § 21A–3–1 (1993) established the Workers' Compensation Performance Council "to ensure the effective, efficient and financially stable operation of the unemployment compensation system and the workers' compensation system of the state of West Virginia." A later Code provision, W. Va.Code § 21A–3–7 (1993), gives the Performance Council power "to [r]eview and approve, reject or modify rules and regulations that are proposed or promulgated by the commissioner for operation of the workers' compensation system before the filing of the rules and regulations with the secretary of state." Thus, new rules are created by the Commissioner, or Division, acting in concert with the Performance Council.

**7.** Appellees argue that this rule is a legislative rule. Appellants claim that this rule is not a

legislative rule because it has been expressly exempted from the legislative approval process. Appellees counter that exempting the rule from the approval process is the equivalent of legislative approval, and thus the rule should still have "the force of a statute itself." *West Virginia Health Care Cost Review Auth. v. Boone Memorial Hosp.,* 196 W.Va. 326, 472 S.E.2d 411 (1996). However, even if we consider the exemption from approval to have imbued the rule with the authority of a legislative rule, the deference we owe does not change. Even when considering a legislative rule, under *Appalachian Power Co. v. State Tax Department of West Virginia,* 195 W.Va. 573, 466 S.E.2d 424 (1995), and its progeny, when a statute is clear, we owe no deference to the agency's rule.

ROM, or Range of Motion Model. The other is called the DRE, or Diagnosis–Related Estimate Model, or simply, the Injury Model, and was newly introduced in the fourth edition of the *Guides*.[8] We shall make reference to either ROM or DRE for the remainder of this opinion.

## C. *Conflict with Statute*

The *Guides, Fourth* is far more than a chart or reference table consulted by doctors; it is a complete set of extremely detailed instructions as to how a doctor should evaluate a claimant's injury. Of particular importance in the instant case is that the *Guides, Fourth* mandates the use of the DRE model for most back injuries.

> The evaluator assessing the spine should use the Injury Model [the DRE], if the patient's condition is one of those listed in Table 70 (p. 108). That model, for instance, would be applicable to a patient with a herniated lumbar disk and evidence of nerve root irritation. If none of the eight categories of the Injury Model is applicable, then the evaluator should use the Range of Motion Model.

*Guides, Fourth,* § 3.3, p. 94. Implicit in this instruction is that very few claimants would ever be evaluated under the ROM Model, since most would fall into one of the eight categories. The *Guides, Fourth,* goes on to list other specific instructions as to not only how a doctor should perform an examination, but what sort of data a doctor should consider, and in some cases, what weight the doctor should give that data. Again, we stress that, by virtue of incorporation by rule, the *Guides, Fourth* section on spinal injuries is far more than a guide, model, or illustration; it is a mechanical set of rules that compels a doctor to consider "x" but exclude "y."

It is with this controlling aspect of the *Guides, Fourth* that appellants most strongly disagree. Appellants point out that several commands of the *Guides, Fourth* appear to be in conflict with specific dictates of the Legislature, and that the spine injury section of the *Guides, Fourth* is also internally inconsistent. In essence, appellants echo the logic expressed in a "policy memorandum" issued by the then-chief administrative law judge, which rejected the DRE Model. Chief Administrative Law Judge Robert Smith issued the policy memorandum shortly after rendering a decision in the case of *Thelma Cottrell v. Workers' Compensation Division and Community Health Associates,* Claim No. 92–56811 (August 22, 1997). In that case, the chief administrative law judge determined that the DRE Model ran afoul of several Code provisions, and as a result, reports conducted in accordance with the DRE are "unreliable" and thus should not be considered in a determination of disability. Appellees argue that the decision of the chief administrative law judge was in excess of his statutory authority, and cannot bind either the Division or the Appeal Board.

Before reaching the question of the administrative law judge's authority, we examine appellants' argument that the DRE conflicts with our workers' compensation statutes. First, appellants point out that the text of the *Guides, Fourth* states that the DRE Model considers a claimant's impairment at the time of the injury, not the time of evaluation, that the text of the DRE Model excludes consideration of occupational wear and tear or so called "developmental findings," and finally, that the *Guides, Fourth* rates one specific injury, but cannot be used where there are sequential injuries to the same body part or when an injury grows worse over time. It is clear that several statutes and opinions of this Court are in apparent conflict with the *Guides, Fourth*.

First, we note that the section we quoted, *supra,* states that "the degree of permanent disability other than permanent total disability shall be determined exclusively by the degree of whole body medical impairment that a claimant *has suffered*." W. Va.Code § 23–4–6(i) (1999) (emphasis added). We be-

---

8. Prior editions of the *Guides* did not contain the DRE Model. As the authors noted "It is acknowledged that the approach is different from that of previous *Guides* editions, and that future developments may lead to refinement or to a different recommendation altogether." *Guides,* *Fourth* § 3.3, p. 94. While not applicable to the case at issue, we note nonetheless that the AMA has since released the fifth edition of the *Guides,* which contains a much modified version of the DRE Model, with broader ranges for each category of spine impairment.

lieve "has suffered" implies that any rating of permanent partial impairment must be made when the claimant has healed as much as possible. Furthermore, the Code suggests that the permanent partial impairment rating of an injured worker must be made after he or she has reached the maximum degree of improvement.

> (c) When the authorized treating physician concludes that the claimant has either reached his or her maximum degree of improvement or is ready for disability evaluation, or when the claimant has returned to work, such authorized treating physician may recommend a permanent partial disability award for residual impairment relating to and resulting from the compensable injury.

W. Va.Code § 23–4–7a(c)(1995); *accord, Dalton v. Spieler,* 184 W.Va. 471, 473, 401 S.E.2d 216, 218 (1990). Clearly, this Code section does not contemplate an impairment rating made based upon the claimant's condition at the time of injury, or even at some time after injury that is prior to reaching the maximum degree of improvement. However, on its face, the DRE Model suggests that once an estimate of impairment is made, subsequent treatment or improvement of the injury should not change the initial estimate.

> With the Injury Model [the DRE], surgery to treat an impairment does not modify the original impairment estimate, which remains the same in spite of any changes in signs or symptoms that may follow the surgery and irrespective of whether the patient has a favorable or unfavorable response to treatment.

*Guides, Fourth* at § 3.3d, p. 100. Although this statement seems at odds with other language in the spine section of the *Guides, Fourth,*[9] it nonetheless directs a physician to ignore the outcome of a claimant's treatment, and to rely upon the first estimate of impairment. By virtue of the Commissioner's decision to incorporate the *Guides, Fourth,* we

are left with a nonsensical command that conflicts with the statute. Although during oral argument before this Court, certain parties intimated that this command is, in practice, ignored, we note that ignoring it doesn't make it disappear. Thus, we believe that this aspect of the DRE Model conflicts with W. Va.Code §§ 23–4–7a (1995) and 23–4–6(i) (1999).

Appellants also argue that the DRE Model, as set forth in the *Guides, Fourth,* is geared more toward rating single incident traumas to the spine, and purports to exclude any injury that appears over time.

> The Injury Model [the DRE] attempts to document physiologic and structural impairments relating to insults other than common developmental findings, such as (1) spondylolysis, found normally in 7% of adults; (2) spondylolisthesis, found in 3%;[10](3) herniated disk without radiculopathy, found in more than 30% of individuals by age 40 years; and (4) aging changes, common in 40% of adults after age 35 years.

*Guides, Fourth,* § 3.3d, p. 100 (footnotes omitted) (footnote added). This sort of analysis would be inappropriate where a workers' injury has occurred over time. We have made clear that: "An employee who is injured gradually by reason of the duties of employment and eventually becomes disabled is, under our workmen's compensation law, no less the recipient of a personal injury than one who suffers a single disabling trauma." Syl. pt. 3, *Lilly v. Workmen's Compensation Commissioner,* 159 W.Va. 613, 225 S.E.2d 214 (1976); *accord,* Syl. pt. 2, *Sansom v. Workers' Compensation Commissioner,* 176 W.Va. 545, 346 S.E.2d 63 (1986). We have also stated that:

> A compensable injury which does not initially or of itself produce a permanent total disability may become progressively worse over time or combine with prior impairments under the second injury statute, W.

**9.** Earlier, the authors stated:

> It is emphasized that if an impairment evaluation is to be accepted as valid under the *Guides* criteria, the impairment being evaluated should be a *permanent* one, that is, one that is stable, unlikely to change within the next year,

and not amenable to further medical or surgical therapy.
*Guides, Fourth* at § 3.3, p. 94.

**10.** Spondylolysis and spondylolisthesis both refer to a slipping or displacement of one or more vertebrae.

Va.Code, 23–3–1, so as to result in a permanent total disability. . . . . ”

Syl. pt. 1, *Lambert v. Workers' Compensation Division,* 211 W.Va. 436, 566 S.E.2d 573 (2002) (quoting *Miracle v. Workers' Compensation Commissioner,* 181 W.Va. 443, 383 S.E.2d 75 (1989)). Obviously, our law contemplates that an injury is not necessarily static, and can become worse over time, a concept to which the DRE is at odds, and to which it must yield.

Another argument advanced by appellants is that W. Va.Code § 23–4–16 (1995) allows a claimant to "re-open" his or her claim if a compensable injury worsens. The Code provides that "in any claim in which an award of permanent disability was made, any such request must be made within five years of the date of the initial award. During that time period, only two such requests may be filed." As we noted above, the authors of the DRE state that the original impairment estimate remains the same, even if a claimant's condition worsens or improves. Thus, a claimant who attempts to reopen a claim would appear to be blocked by this language. Moreover, even if we accept the appellees' argument that this language can be ignored or explained, a claimant evaluated under the DRE Model who attempts to reopen still faces the enormous challenge of getting out of the "box" or category of his or her initial rating.

This same problem also befalls a claimant who does not attempt to reopen for a change in an injury, but is simply injured a second time in a separate incident. The Code provides for additional compensation for claimants who become further impaired as a result of a second injury. *See,* W. Va.Code § 23–4–6(d) (1999). Because the DRE puts a claimant in one category or another, his or her rating will be 5 percent, 10 percent, 15 percent, etc. Once rated at 5 percent, for example, a claimant must suffer a severe enough second injury to make the quantum leap between the 5 percent category and the 10 percent category. Thus, a claimant whose second injury under the ROM Model would have moved him or her from 5 percent to 7 percent, would remain stuck at 5 percent under the DRE Model. Thus, there is effectively no compensation for a second injury

under this scenario, which we believe conflicts with our law.

### D. *The Office of Judges*

As we noted, it is because of these specific conflicts that the Workers' Compensation Office of Judges developed a policy that rejected examinations performed under the DRE Model as being contrary to law and thus unreliable. Appellees argue that the chief administrative law judge had no authority to issue a so-called policy memorandum directing other administrative law judges to exclude examinations conducted pursuant to the DRE. We have noted that the Office of Judges has the authority to create its own rules of practice and procedure: "The Legislature has empowered the OOJ to craft rules of practice and procedure for the review of disputed claims." *Plummer v. Workers' Compensation Division,* 209 W.Va. 710, 715, 551 S.E.2d 46, 51. The authorizing statute states:

> Subject to the approval of the compensation programs performance council pursuant to subdivisions (b) and (c), section seven, article three, chapter twenty-one-a of this code, the office of judges shall from time to time promulgate rules of practice and procedure for the hearing and determination of all objections to findings or orders of the workers' compensation division pursuant to section one of this article. The office of judges shall not have the power to initiate or to promulgate legislative rules as that phrase is defined in article three, chapter twenty-nine-a of said code.

W. Va.Code § 23–5–8(e) (2001). We also note that the Code provides the chief administrative law judge with broad authority to exercise such powers as may be necessary for the proper administrative review of disputed claims.

> The chief administrative law judge shall continue to have the power to hear and determine all disputed claims in accordance with the provisions of this article, establish a procedure for the hearing of disputed claims, take oaths, examine witnesses, issue subpoenas, establish the amount of witness fees, keep such records and make such reports as are necessary

for disputed claims and exercise such additional powers, including the delegation of such powers to administrative law judges or hearing examiners as may be necessary for the proper conduct of a system of administrative review of disputed claims. The chief administrative law judge shall make such reports as may be requested of him or her by the compensation programs performance council.

W. Va.Code § 23–5–8(f) (2001).

Appellees still argue that the decision in *Cottrell*, and subsequent policy memorandum, could not act as binding precedent on other administrative law judges, the Division, or the Appeal Board. Appellants argue that the *Cottrell* policy memorandum was never intended to be applied in that fashion, but rather provided notice to all litigants that medical evaluations relying upon the DRE Model were unreliable to support a finding regarding a claimant's degree of impairment before the Office of Judges, only. Thus, they argue, this memorandum did not promulgate a legislative rule as asserted by defense counsel nor did it establish a precedent before the Division or Appeal Board. That is to say, argue appellants, the policy memorandum about *Cottrell* was necessary precisely because the decision in *Cottrell* did not have precedential value.

 We concur that W. Va.Code § 23–5–8(f) (2001) gives the chief administrative law judge broad authority to manage cases before the Office of Judges.[11] We agree with the appellees that neither a policy memorandum, nor a decision by the Office of Judges can bind the Division or the Appeal Board in all future claims, but we find no authority that would prohibit the chief administrative law judge from enacting a uniform policy for his or her office to follow.

11. We also note that it is not uncommon for an administrative agency, when deciding an issue, to rely upon internal decisions that share similar factual situations or questions of law. For example, W. Va.Code § 6–9A–10 (1999), creates from the West Virginia Ethics Commission, a subcommittee called the "West Virginia ethics commission committee on open governmental meet-

### E. *Incorporation by Reference*

 Some might argue that the use of the *Guides, Fourth* amounts to an impermissible delegation of the Legislature's power to a group of non-elected doctors and experts. However, we note that the delegation of authority to an agency for rule-making purposes is permitted. It is clear that the Legislature may delegate certain powers or responsibilities to an agency: " 'The delegation by the legislature of broad discretionary powers to an administrative body, accompanied by fitting standards for their exercise, is not of itself unconstitutional.' Point 8 Syllabus, *Chapman v. Huntington, West Virginia, Housing Authority*, 121 W.Va. 319 [, 3 S.E.2d 502 (1939) ]." Syl. pt. 5, *State ex rel. W. Va. Hous. Dev. Fund v. Copenhaver*, 153 W.Va. 636, 171 S.E.2d 545 (1969). And we note that incorporation of a standard not created by the Legislature is permitted, provided that the standard is static. Because of changes made in the *Guides*, some might argue that the proper course of action would be to apply the language of the most recent version. However, changes to an already adopted standard cannot be made "automatically."

In a case from North Dakota, the relevant statute required examinations be conducted in accordance with "the most recent edition" of the *Guides*. On the date of the statute's enactment, the most recent edition was the third revised edition of the *Guides*, but when the worker was evaluated in 1994, the *Guides, Fourth* was the most recent edition. The worker received a 20 percent evaluation from his doctor under the ROM Model, but the Bureau had him evaluated by another doctor under the DRE Model, which resulted in an impairment rating of 10 percent. The worker appealed and the Supreme Court of North Dakota held that, while incorporation of an existing standard is permissible, the attempted adoption of a future standard would be unconstitutional.

ings." W. Va.Code § 6–9A–11 (1999) empowers that subcommittee to issue advisory opinions on questions concerning governmental meetings. While the statute provides that "the opinion shall be binding on the parties requesting the opinion" is it clear that the practice of that committee is to apply its existing decisions to new questions, if the existing decision is on point.

Numerous other courts hold that a statute that attempts to incorporate future changes of another statute, code, regulation, standard, or guideline is an unconstitutional delegation of legislative power. *See, e.g., International Ass'n of Plumbing and Mechanical Officials v. California Bldg. Standards Comm'n,* 55 Cal.App.4th 245, 64 Cal.Rptr.2d 129, 134 (1997); *People v. Pollution Control Bd.,* 83 Ill.App.3d 802, 38 Ill.Dec. 928, 932–933 404 N.E.2d 352, 356–357 (1980); *Gumbhir v. Kansas State Bd. of Pharmacy,* 228 Kan. 579, 618 P.2d 837, 842–843 (1980); *Board of Trustees v. City of Baltimore,* 317 Md. 72, 562 A.2d 720, 731 (1989); *Michigan Mfrs. Ass'n v. Director of Workers' Disability Compensation Bureau,* 134 Mich.App. 723, 352 N.W.2d 712, 715 (1984); *Meyer v. Lord,* 37 Or.App. 59, 586 P.2d 367, 371 (1978); *City of Chamberlain v. R.E. Lien, Inc.,* 521 N.W.2d 130, 132–133 (S.D.1994); *Independent Community Bankers Ass'n v. State,* 346 N.W.2d 737, 744 (S.D.1984); *Woodson v. State,* 95 Wash.2d 257, 623 P.2d 683, 685 (1980).... We agree with those courts taking this view.

*McCabe v. North Dakota Workers Compensation Bureau,* 567 N.W.2d 201, 204–05 (N.D.1997).

 The distinction is that, when an existing standard is incorporated by reference, there is the presumption that a legislature is familiar with that standard in its entirety and approves of it. However, by attempting to incorporate a standard, plus any modifications it might undergo, a legislature is delegating its authority to the non-elected authors of the standard, who could then change the standard in some way not contemplated by the legislature. *See, Michigan Mfrs. Ass'n v. Director of Workers' Disability Compensation Bureau,* 134 Mich.App. 723, 352 N.W.2d 712, 715 (1984) (statute was not an impermissible delegation of authority to

an association to create a standard because statute made a valid adoption of a standard already in existence.)

However, while permissible, the incorporation of a publication like the *Guides, Fourth* is far more troublesome than the incorporation of pure data, or a printed chart, or a schedule of impairment values.[12] Statutes and rules are written by lawyers with the understanding that any word written may eventually be subject to construction or attack by other lawyers. Thus, statutes and rules generally have very specific definitions and the authors take pains to make them internally consistent and as unambiguous as possible. An instruction manual written by doctors for doctors is not usually composed with these concerns in mind.

Appellees argue that the advantage of the DRE is that it is somehow more objective than the ROM. Indeed, the *Guides* state that the purpose of the DRE is to counter objection that the ROM is too subjective:

One of the purposes of the *Guides* is to lead to similar results when different clinicians evaluate illnesses and impairments. For evaluating spine impairments, past *Guides* editions have used a system based on assessing the degree of spine motion and assigning impairment percentages according to limitations of motion. Impairment percents related to the range of motion were to be combined with percents based on diagnoses or therapeutic approaches and neurologic impairments.

One concern with the range of motion system has been that in applying it, other clinical data and diagnostic information tend to be ignored. Also some physicians are concerned about the accuracy and reproducibility of mobility measurements, while others believe the system fails to account for the effects of aging.

*Guides, Fourth* § 3.3. p. 94. However, we find it important to restate that the spinal

---

**12.** Other observers have remarked upon the shortcomings of incorporation by reference:

[I]ncorporation by reference may complicate the task of ascertaining the meaning of legislation; it may permit the passage of statutes that could not have garnered majority support if the effects of the incorporated texts were fully understood; and it may promote the passage

of statutes without full and intelligent consideration.

Jonathan R. Siegel, *The Use of Legislative History in a System of Separated Powers,* 53 Vand. L.Rev. 1457, 1488 (2000) (footnote omitted) (citing, Horace Emerson Read, *Is Referential Legislation Worth While?,* 25 Minn. L.Rev. 261, 277 (1941)).

section of the *Guides, Fourth* is not simply a "guide" as the name would imply—it is a set of instructions to be followed. While a uniform set of instructions, on its face, would appear to offer some degree of objectivity in examinations, one must be convinced that the process that created that set of instructions was itself objective, reasonable, or impartial. We remain unconvinced that the DRE is somehow perfectly objective. As one scholar has explained, it is wrong to assume that the *Guides* are somehow perfect or flawless.

> [T]he Guides is not the objective, medical evaluative system that it purports to be and that has been so appealing to legislators and other decision makers. Instead, like any impairment rating scheme, it rests in large part on important and difficult normative judgments. Yet the Guides obscures this from the reader; it is laden with hidden or poorly explained value judgments that frequently are gender-biased. The Guides' flawed promises of objectivity are especially troubling because they appeal to the craving of legislators and other decision makers for certainty and clarity in the difficult arena of impairment and disability assessment. By uncritically embracing the Guides, these decision makers delegate significant normative decisions to the book's medical authors.

Ellen Smith Pryor, *Flawed Promises: A Critical Evaluation of the American Medical Association's Guides to the Evaluation of Permanent Impairment*, 103 Harv. L.Rev. 964, 965–66 (1990) (footnote omitted).[13]

Of course, the Legislature can adopt any system it wants, within the ambit of our constitution, to evaluate injuries, impairments, or disabilities. But we must recognize that merely labeling an evaluation system as objective and making uniform application of it does not somehow make that system a perfect one.

> This vast literature on measurement, at least implicitly, makes a critical point: it is impossible to define and measure impairment (both organ and whole-person level) except in relation to some norm. Hence, any organ-level impairment evaluation requires (1) a decision about what organ-

level qualities (e.g., range of motion) are relevant to the measurement, and (2) a decision about what degree of that quality will serve as the norm. Similarly, a whole-person impairment evaluation requires (1) a decision about what activities or qualities are relevant to the measurement, and (2) a decision about what levels of ability will serve as the norm.

> The need for these decisions dooms the Guides' claims that its impairment evaluation scheme is objective and purely medical. These claims seem most appealing with respect to some organ-level impairments, such as those to the orthopedic extremities, where one might argue that a basic consensus exists on the qualities that should serve as the norm (such as range of motion). But even this argument does not justify the Guides' claims of objectivity and of its medical nature.

*Id.* at 968–69 (footnote omitted). In short, the Commissioner, in concert with the Performance Council may, within the bounds of their authority, adopt the standard of their choosing, but we must remember that the introduction of the *Guides, Fourth* into our workers' compensation system was not accompanied by a burning bush, or even direct action of the Legislature. Thus, when we find it to be in conflict with our existing statutory law, we must adhere to the law.

There is no question that when the rules of an agency come into conflict with a statute that the statute must control:

> Any rules or regulations drafted by an agency must faithfully reflect the intention of the Legislature, as expressed in the controlling legislation. Where a statute contains clear and unambiguous language, an agency's rules or regulations must give that language the same clear and unambiguous force and effect that the language commands in the statute.

Syl. pt. 4, *Maikotter v. University of West Virginia Bd. of Trustees/West Virginia Univ.*, 206 W.Va. 691, 527 S.E.2d 802 (1999). Or in other words: "Although an agency may have power to promulgate rules and regulations, the rules and regulations must be rea-

---

**13.** Professor Pryor chose to refer to the *Guides* in the singular. See footnote 4, *supra*.

sonable and conform to the laws enacted by the Legislature." *Anderson & Anderson Contractors, Inc. v. Latimer*, 162 W.Va. 803, 807–08, 257 S.E.2d 878, 881 (1979) (citing *Sheppe v. West Virginia Bd. of Dental Exmrs.*, 147 W.Va. 473, 128 S.E.2d 620 (1962)).

■ The power of the Legislature is paramount when a court is faced with a conflict between a statute and a rule:

> It is fundamental law that Legislature may delegate to an administrative agency power to make rules and regulations to implement the statute under which the agency functions. In exercising that power, however, an administrative agency may not issue a regulation which is inconsistent with, or which alters or limits its statutory authority.

Syl. pt 3, *Rowe v. W. Va. Dept. of Corrections*, 170 W.Va. 230, 292 S.E.2d 650 (1982); *accord, CNG Transmission Corp. v. Craig*, 211 W.Va. 170, 564 S.E.2d 167 (2002); *State ex rel. McKenzie v. Workers' Compensation Commissioner*, 212 W.Va. 288, 569 S.E. 809 (2002.)[14] Though the courts have the power to harmonize a rule with an ambiguous statute, we must follow the will of the Legislature when expressed with clarity. "The judiciary is the final authority on issues of statutory construction, and we are obliged to reject administrative constructions that are contrary to the clear language of a statute." Syl. pt. 5, *CNG Transmission Corp. v. Craig*, 211 W.Va. 170, 564 S.E.2d 167 (2002).

■ As we noted earlier in this opinion, in those instances where an agency rule addresses some issue that is already the subject of Legislative action, "[i]f the intention of the Legislature is clear, that is the end of the matter, and the agency's position only can be upheld if it conforms to the Legislature's intent." Syl. pt. 3, in part, *Appalachian Power Co. v. State Tax Department of West Virginia*, 195 W.Va. 573, 466 S.E.2d 424 (1995).

■ We must apply the same standard to the rule in this case. Thus, we hold that a rule promulgated by the workers' compensation division that mandates the use of a non-legislatively created guide for the examination of certain injuries is valid only to the extent that the mandated guide does not conflict with the specific dictates of the Legislature as expressed by statute. Those aspects of the mandated guide that are in conflict are invalid.

■ The DRE Model for the evaluation of spinal injuries conflicts with our law in several areas. The DRE disagrees with statutes that control: the proper time for making an impairment rating, the proper treatment of progressive injuries, the procedure for reopening a claim, and the consideration of a second injury. Any aspect of the *Guides, Fourth* that conflicts with these statutes must fail. Accordingly, we hold, because the Diagnosis–Related Estimate Model for the examination of spine injury claims, as set forth in The American Medical Association's, *Guides to the Evaluation of Permanent Impairment, Fourth Edition* (1993), cannot be reconciled with several specific workers' compensation statutes promulgated by the West Virginia Legislature, any medical examination conducted in accordance with that model is invalid and unreliable.

Some might argue that the *Guides, Fourth* were adopted in an effort to hold down costs in the workers' compensation system. In arguments before this Court, counsel for appellants suggested that compensation for back injuries was greatly reduced by the application of the DRE Model. We note that at least one observer suggests that the problems of our workers' compensation system are not the result of overpayment, but rather of under-collection.[15] But we take the more

---

**14.** We held recently in *McKenzie* that a system of using so-called "preferred providers" for the rehabilitation of injured workers was violative of statute, and therefore invalid. Specifically we held that: "The Commissioner's regulations, policies and procedures regarding referral of claimants to an 'employer's preferred provider for rehabilitation services' are contrary to the clear language of the Workers' Compensation Act, and therefore void and unenforceable." Syl. pt. 13, *State ex rel. McKenzie v. Workers' Compensation Commissioner*, 212 W.Va. 288, 569 S.E.2d 809, (2002).

**15.** Again, as noted by former Commissioner Spieler:

charitable view that the Commissioner adopted the *Guides, Fourth* in an effort to determine once and for all "objective" rules or procedures that produce a "fair" result. But only one thing is clear: no matter what sort of guides, rules, procedures, or standards the Legislature or Commissioner may adopt, none can yield an "exact" or "correct" estimate of impairment or disability that is beyond reproach. "The rating of disabilities, regardless of legislative precision or medical expertise, remains an inexact science." *Griffith v. State Workmen's Compensation Comm'r*, 157 W.Va. 837, 843, 205 S.E.2d 157, 161 (1974); *Accord, Miracle v. Workers' Compensation Comm'r*, 181 W.Va. 443, 446, 383 S.E.2d 75, 78 (1989); *Lambert v. Workers' Compensation Division*, 211 W.Va. 436, 566 S.E.2d 573 (2002).

We are also concerned that, in a quest for bright line rules and predictability, participants in the workers' compensation system may latch onto "buzzwords" or phrases to decide a case. We fear that most any sentence in this, or any opinion, could be fastened upon by the Commissioner, Office of Judges, or Appeal Board and be imbued with near magical powers and employed almost as a spell or incantation that can "open the lock" for a claimant seeking compensation. We wish to do all that we can to discourage the use of such "magic words," as we recently noted in a case concerning permanent total disability claims:

> The unfunded liability of the Workers' Compensation Fund is ultimately the result of the failure to collect adequate premiums in order to fund the promises made to pay benefits to workers. Notably and *indisputably*, the premium levels charged to subscribing employers in West Virginia have been comparatively low since the mid–1980s, when compared nationally or within this region. In 1985, the Moore Administration chose to reduce premium rates by 30 percent and to freeze the premiums at this unsound—and illegal—level. Premium rates were not adjusted until 1989. While premium levels all over the country rose dramatically from 1985 to 1990, West Virginia's premium rates were artificially suppressed. *Premium levels in West Virginia have never regained the level they should and would have attained if the reduction had not occurred.*
>
> Since 1989, increases in West Virginia have *not overtaken* national average increases. Because of the rate reduction in 1985 and the subsequent failure to increase rates for over

In practical application, this holding seems to have resulted in the Division searching medical, psychiatric, and vocational reports for a magical phrase stating "the claimant is permanently and totally disabled from future employment,". . . If the magical words have not been included, the content to the report appears to often be disregarded. . . . [W]e specifically discourage compete reliance on buzzwords contained in medical evaluations. Instead, the Division should look at the record as a whole and give due consideration to the actual content of medical reports to determine whether they support a finding of PTD and may, thus, indicate the onset thereof.

*Lambert v. Workers' Compensation Division*, 211 W.Va. 436, 446, 566 S.E.2d 573 (2002). We again encourage the Division to look at a claimant's record as a whole, and to resist a simplistic review based upon "magic words."

## IV.

## CONCLUSION

For the reasons stated, the judgment of the Workers' Compensation Appeal Board is reversed, and these cases are remanded for further proceedings consistent with this opinion.

Reversed and remanded.

> three years, West Virginia's rates continue to lag substantially behind national norms. According to a 1994 study undertaken by the Oregon Department of Consumer and Business Services, West Virginia's premiums ranked near the bottom in premium cost (46th) in 1994—after the rate increases in 1989 –1993. Other studies consistently show similar results.

Emily A. Spieler, *Assessing Fairness in Workers' Compensation Reform: A Commentary on the 1995 West Virginia Workers' Compensation Legislation*, 98 W. Va. L.Rev. 23, 84–85 (1995)(footnotes omitted) (emphasis in original). We have also noted that the decision of a more recent governor not to pursue lawsuits against employers who may have failed to pay required premiums for their contract employees had a serious and deleterious impact on our workers' compensation fund. *See, State ex rel. Affiliated Constr. Trades Found. v. Vieweg*, 205 W.Va. 687, 520 S.E.2d 854 (1999)(McGraw, J. & Starcher, J., dissenting).

DAVIS, C.J., dissenting.

(Filed July 17, 2002)

It has been said that "[t]he law is the only profession which records its mistakes carefully, exactly as they occurred, and yet does not identify them as mistakes[.]"[1] Truer words could not be spoken of the majority's decision in the case *sub judice* where, with one fell swoop, the Court completely ignores the directives of the workers' compensation legislation which it claims to uphold and proceeds to substitute its own judgment in its stead as to the most reliable indicator of an injured claimant's compensable disability. Not only has the majority successfully turned the rule of liberality into a rule of *laissez-faire*, but it also has failed to recognize that the very result of this ruling will hurt, rather than help, the injured workers of this State. Accordingly, for the various reasons stated below, I dissent.

### A. *Workers' Compensation: A Legislatively–Administered Program*

The first mistake with the majority's reasoning is its misunderstanding of the nature of the workers' compensation system as a legislatively created and legislatively *administered* program. In 1913, the Legislature created the State's workers' compensation system.[2] As a result of this legislation, we frequently have recognized that "[t]he right to workmen's compensation benefits is wholly statutory." Syl. pt. 2, in part, *Dunlap v. State Comp. Dir.*, 149 W.Va. 266, 140 S.E.2d 448 (1965). *Accord Boyd v. Merritt*, 177 W.Va. 472, 474, 354 S.E.2d 106, 108 (1986) ("The right to workers' compensation benefits is wholly a creature of statute[.]"). For this reason,

> "[i]t has been held repeatedly by this Court that the right to workmen's compensation benefits is based wholly on statutes, in no sense based on the common law; that such statutes are sui generis and controlling; that the rights, remedies and procedures thereby provided are exclusive; that the commissioner is authorized to award

and pay benefits and that a claimant is authorized to demand payment of benefits only in such manner and in such amounts as are authorized by applicable statutes."

*Roberts v. Consolidation Coal Co.*, 208 W.Va. 218, 234, 539 S.E.2d 478, 494 (2000) (quoting *Bounds v. State Workmen's Comp. Comm'r*, 153 W.Va. 670, 675, 172 S.E.2d 379, 382–83 (1970) (citations omitted)) (additional citations omitted). Due to the statutory nature of the workers' compensation program, the Legislature possesses exclusive authority over the workers' compensation fund, itself, and the distribution of such monies to injured workers. *See generally Lester v. State Workmen's Comp. Comm'r*, 161 W.Va. 299, 315, 242 S.E.2d 443, 452 (1978) ("[T]he legislature has the power to modify this state's industrial insurance program as it sees fit so long as no constitutional provision is infringed."); *Bailes v. State Workmen's Comp. Comm'r*, 152 W.Va. 210, 212, 161 S.E.2d 261, 263 (1968) ("The right to workmen's compensation is wholly statutory and is not in any way based on the common law. The statutes are controlling and the rights, remedies and procedure provided by them are exclusive." (citation omitted)).

One such power the Legislature exercises in this regard, and which is the subject of the case *sub judice*, is the authority to adopt rules and regulations to be used in quantifying a claimant's work-related injury into a compensable disability rating. In furtherance of this task, the Legislature has delegated the corresponding rule-making function to the Commissioner of the Bureau of Employment Programs and the Workers' Compensation Division thereof. *See* W. Va. Code § 23–1–1(b) (2000) (Supp.2001) ("The commissioner is authorized to promulgate rules and regulations to implement the provisions of this chapter."); W. Va.Code § 21A–2–6(2) (1996) (Supp.2001) (recognizing Commissioner's authority to "promulgate rules"); Syl. pt. 7, *Smith v. State Workmen's Comp. Comm'r*, 159 W.Va. 108, 219 S.E.2d 361 (1975) ("The State Workmen's Compensation Commissioner may exercise not only the

---

1. Elliot Dunlap Smith, *quoted in* Louis M. Brown, *Legal Autopsy*, J. Am. Judicature Soc'y 47 (June 1955).

2. *See* 1913 Acts of the Legislature, Regular Session, c. 10.

powers expressly granted the office by statute, but also such additional powers of a procedural or administrative nature as are reasonably implied as a necessary incident to the expressed powers of the office."). *See also* W. Va.Code § 23–1–13(a) (1995) (Repl. Vol.1998) ("The workers' compensation division shall adopt reasonable and proper rules of procedure, regulate and provide for ... the nature and extent of the proofs and evidence, the method of taking and furnishing the same to establish the rights to benefits or compensation from the fund ... or directly from employers ..., and the method of making investigations, physical examinations and inspections[.]"); W. Va.Code § 23–4–6(i) (1999) (Supp.2001) ("The workers' compensation division shall adopt standards for the evaluation of claimants and the determination of a claimant's degree of whole body medical impairment.").

To facilitate the adoption of such rules and regulations for disability determinations, the Legislature authorized the Commissioner to create the Health Care Advisory Panel to assist with the "[e]stablish[ment of] protocols and procedures for the performance of examinations or evaluations performed by physicians or medical examiners[.]" W. Va.Code § 23–4–3b(b) (1990) (Repl.Vol.1998). Similarly, the Legislature established the Compensation Programs Performance Council, [hereinafter referred to as the "Performance Council"] W. Va.Code § 21A–3–1 (1993) (Repl.Vol.1996), to further assist the Commissioner with the development of such criteria and to "[r]ecommend legislation and establish regulations designed to ensure the effective administration and financial viability of ... the workers' compensation system of West Virginia." W. Va.Code § 21A–3–7(b) (1993) (Repl.Vol.1996).[3] The Performance Council is additionally charged with the "[r]eview and approv[al], reject[ion] or modif[ication of] rules and regulations that are pro-

posed or promulgated by the commissioner for the operation of the workers' compensation system before the filing of the rules and regulations with the secretary of state." W. Va.Code § 21A–3–7(c).

In pursuit of this rule-making function, the Commissioner and the Performance Council, informed by the Health Care Advisory Panel, adopted "Guidelines for Permanent Impairment Evaluations, Evidence, and Ratings." *See* W. Va.C.S.R. § 85–16–1, *et seq.* As it relates to the instant appeal, these rules specifically direct that

> on and after the effective date of this rule all evaluations, examinations, reports, and opinions with regard to the degree of permanent whole body medical impairment which a claimant has suffered shall be conducted and composed in accordance with the "Guides to the Evaluation of Permanent Impairment," (4th ed.1993), as published by the American Medical Association[.]

W. Va.C.S.R. § 85–16–4.1 (1996). In short, the practical effect of this regulation is to require examining physicians to evaluate claimants according to the Diagnosis–Related Estimates [hereinafter referred to as "DRE"] model as opposed to the Range of Motion [hereinafter referred to as "ROM"] model.[4]

To this point, I agree with the majority's analysis. However, it is beyond this juncture that I must part ways with my colleagues and disagree with their reasoning and resultant holdings. Rather than according deference to the Legislature and its attendant entities charged with administering the West Virginia workers' compensation system, the Court takes it upon itself to impermissibly sit as a superlegislature and replace the Commissioner's well-informed guidelines with its preferred method of impairment evaluation

---

**3.** Members of the Performance Council are appointed by the Governor, "by and with the advice and consent of the Senate." W. Va.Code § 21A–3–2 (1993) (Repl.Vol.1996). In particular, "[t]he compensation programs performance council shall consist of nine members: Four representing the interests of employees; four representing the interests of employers; and the commissioner of the bureau of employment programs." W. Va. Code § 21A–3–3 (1993) (Repl.Vol.1996). The

Council's present members are Gene F. Bailey, Richard W. Humphreys, Chris E. Jarrett, John L. Johnson, Douglas W. Merritt, Robert Phalen, Everette E. Sullivan, Paul E. Thompson, and Commissioner Robert J. Smith.

**4.** For further discussion of the DRE and ROM models, see Section B, *infra.*

for spinal injury claims. *See Lewis v. Canaan Valley Resorts, Inc.*, 185 W.Va. 684, 692, 408 S.E.2d 634, 642 (1991) ("[T]he judiciary may not sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines." (citing *City of New Orleans v. Dukes*, 427 U.S. 297, 303, 96 S.Ct. 2513, 2517, 49 L.Ed.2d 511, 517 (1976) (per curiam))); *Boyd v. Merritt*, 177 W.Va. at 474, 354 S.E.2d at 108 ("This Court does not sit as a superlegislature, commissioned to pass upon the political, social, economic or scientific merits of statutes pertaining to proper subjects of legislation. It is the duty of the legislature to consider facts, establish policy, and embody that policy in legislation.").

As the majority aptly notes,

[i]t is fundamental law that the Legislature may delegate to an administrative agency the power to make rules and regulations to implement the statute under which the agency functions. In exercising that power, however, an administrative agency may not issue a regulation which is inconsistent with, or which alters or limits its statutory authority.

Syl. pt. 3, *Rowe v. W.Va. Dept. of Corrs.*, 170 W.Va. 230, 292 S.E.2d 650 (1982). Once such a delegation has been made, we typically defer to said agency's interpretations of its governing legislation absent a departure from the original statutory authority imbuing the agency with such power. Syl. pt. 8, *Smith v. State Workmen's Comp. Comm'r*, 159 W.Va. 108, 219 S.E.2d 361 (" 'Where a statute is of doubtful meaning, the contemporaneous construction placed thereon by the officers of government charged with its execution is entitled to great weight, and will not be disregarded or overthrown unless it is clear that such construction is erroneous.' *Syllabus* point 7., *Evans v. Hutchinson*, [158] W. Va. [359], 214 S.E.2d 453 (1975)."). It goes without saying that "[t]he practice of deferring to rationally based legislative enactments is a paradigm of judicial restraint." *State ex rel. Affiliated Constr. Trades Found. v. Vieweg*, 205 W.Va. 687, 698, 520 S.E.2d 854, 865 (1999) (per curiam) (Workman, J., concurring) (internal quotations and citation omitted). Furthermore, with respect to the scenario presently at hand, we have held that

[i]nterpretations as to the meaning and application of workers' compensation statutes rendered by the Workers' Compensation Commissioner, as the governmental official charged with the administration and enforcement of the workers' compensation statutory law of this State, pursuant to W. Va.Code § 23–1–1 (1997) (Repl.Vol. 1998), should be accorded deference if such interpretations are consistent with the legislation's plain meaning and ordinary construction.

Syl. pt. 4, *State ex rel. ACF Indus., Inc. v. Vieweg*, 204 W.Va. 525, 514 S.E.2d 176 (1999).

Despite these assurances of deference to the Commissioner, who has been entrusted by the Legislature with the administration of the workers' compensation system and the promulgation of rules and regulations to achieve that end, the majority nevertheless substitutes its own judgment for that of the Commissioner, who was duly advised by the Performance Council. If the Commissioner's position could be shown to be contrary to the governing statutes from which he derived his rule-making authority, or if the impairment criteria he has adopted contravened the Legislature's purpose of compensating injured workers, the Court's decision would be tenable. However, apart from a *sua sponte* declaration that the Commissioner's actions oppose the legislative intent, no support is given for the majority's position. Absent this clear indication that the Commissioner has acted inappropriately by promulgating and applying W. Va.C.S.R. § 85–16–4.1, the majority has made a grievous mistake.

Moreover, the majority has erred not only by refusing to defer to the Commissioner but by further imbuing the Office of Judges [hereinafter referred to as the "OOJ"] with rule-making powers which the Legislature never intended it to possess. Throughout its Opinion, the Court references the now infa-

mous *Cottrell* decision [5] wherein the Chief Administrative Law Judge determined the DRE model of impairment evaluation to be unreliable and announced his intention to disregard such evidence in future claims. My colleagues then laud this position as being the surest course to achieving the legislative objective of providing relief to ailing claimants. Ironically, though, the Legislature *never* intended to accord decisions of the OOJ such deference as it specifically prohibits that entity from formulating, establishing, or otherwise adopting any rule or regulation: "The office of judges *shall not* have the power to initiate or to promulgate legislative rules[.]" W. Va.Code § 23–5–8(e) (2001) (Supp.2001) (emphasis added). As the OOJ is *not, and never has been, imbued with such* rule-making authority, the majority's decision to rely upon and embrace the *Cottrell* ruling is just plain wrong.

## B. DRE versus ROM Impairment Ratings

The next grievous error committed by the majority concerns its mistaken interpretation of the American Medical Association's *Guides to the Evaluation of Permanent Impairment* (4th ed.1993, reprinted 1995) [hereinafter referred to as the "*Guides*"] adopted by the Commissioner and its ultimate conclusion that such *Guides* are much more restrictive than their plain language would suggest insofar as they apply to compensable spine injuries. In its decision, the Court correctly states that early editions of the *Guides* authorized examiners to use the ROM model in making their disability determinations. *See generally Guides* § 3.3, at 94. Beginning in the 1993 edition of the *Guides,* however, upon which edition the Commissioner relies in W. Va.C.S.R. § 85–16–4.1, the *Guides* abandoned the predominance of the ROM model in favor of the DRE model, which is considered to be a more reliable indicator of an individual's actual degree of impairment resulting from work-related spinal injuries. Therefore, at present, "under the *Guides* the only reason to utilize the [ROM] model [i]s if an injury [i]s not clearly enough defined in

the DRE model." *Thomas v. United Parcel Serv.,* 58 S.W.3d 455, 457 (Ky.2001) (per curiam).

Armed with this knowledge, the majority abruptly halts its investigation into the validity of the DRE model versus the ROM model. Further review of the actual language employed in the *Guides,* however, suggests that the ill-informed decision to completely abandon any reference to the DRE model in disability evaluations was perhaps too hastily made. In its most basic and rudimentary sense, in simplistic and uncomplicated language, the *Guides* specifically advocate the employment of both methodologies to evaluate a claimant's degree of spinal impairment, rather than the wholesale adoption of the DRE model to the complete exclusion of the ROM methodology as suggested by the majority.

One of the purposes of the *Guides* is to lead to similar results when different clinicians evaluate illnesses and impairments. For evaluating spine impairments, past *Guides* editions have used a system based on assessing the degree of spine motion and assigning impairment percents according to limitations of motion. Impairment percents related to the range of motion were to be combined with percents based on diagnoses or therapeutic approaches and neurologic impairments.

One concern with the range of motion system has been that in applying it, other clinical data and diagnostic information tend to be ignored. Also, some physicians are concerned about the accuracy and reproducibility of mobility measurements, while others believe the system fails to account for the effects of aging.

. . . .

[A] recent study of objective methods for examining patients with chronic low-back pain and self-reported, everyday disabilities identified seven clinical measurements that distinguish well between the patients with pain and normal subjects. . . .

In this edition of the *Guides,* the contributors have elected to use two ap-

---

**5.** *Cottrell v. Workers' Comp. Div.,* Claim No. 92–66811 (W. Va. Workers' Comp. Office of Judges Aug. 22, 1997).

proaches. One component, which applies especially to patients' traumatic injuries, is called the "Injury Model" [or "Diagnosis–Related Estimates (DRE) Model"]. This part involves assigning a patient to one of eight categories, such as minor injury, radiculopathy, loss of spine structure integrity, or paraplegia, on the basis of objective clinical findings. The other component is the "Range of Motion Model," described above and recommended in previous *Guides* editions.

. . . .

If none of the eight categories of the Injury [DRE] Model is applicable, then the evaluator should use the Range of Motion Model.

All persons evaluating impairments according to *Guides* criteria are cautioned that either one *or* the other approach should be used in making the final impairment estimate. . . . However, if disagreement exists about the category of the Injury Model in which a patient's impairment belongs, then the Range of Motion Model may be applied to provide evidence on the question.

*Guides* § 3.3, at 94 (endnote omitted) (emphasis in original). Thus, it is apparent that the *Guides* advocate the use of the DRE model because it is more reliable than the former ROM model, which yields inconsistent results that are difficult to reproduce when a claimant is examined by a variety of physicians and fails to account for non-compensable conditions that may aggravate the compensable injury.

In spite of the *Guides'* efforts to promote accurate and reliable disability ratings, the majority forsakes such principles and adopts the ROM model because, they claim, the rule of liberality dictates such a result. Reaching such a conclusion, however, the majority fails to appreciate the very direct and concise language of the *Guides* which counsels examiners to employ "either one *or* the other approach . . . in making the final impairment estimate" and permits reference to be made to the ROM model where disagreement exists as to a definite DRE diagnosis. *Guides* § 3.3, at 94 (emphasis in original). Thus, it is apparent that, insofar as the majority of

the Court is concerned, accuracy and reliability have no place in rating back impairments if the evaluation criteria leading thereto does not consistently award the injured claimant the highest disability rating and, consequently, the biggest workers' compensation benefits check.

The majority additionally, and incorrectly, argues that the DRE model can only be used prior to a claimant reaching his/her maximum medical improvement [hereinafter referred to as "MMI"]. To support this assertion, the majority has taken a passage from the *Guides* out of context. In this respect, my colleagues contend that the *Guides'* statement that "surgery to treat impairment does not modify the original impairment estimate" under the DRE model actually means that the DRE model can only be used prior to a claimant reaching MMI. This is absurd. The *Guides* explicitly, unequivocally, and repeatedly emphasize that the claimant must reach MMI prior to being evaluated for impairment. *See, e.g., Guides* § 3.3, at 94 ("It is emphasized that if an impairment evaluation is to be accepted as valid under the *Guides* criteria, the impairment being evaluated should be a *permanent* one, that is, one that is stable, unlikely to change within the next year, and not amenable to further medical or surgical therapy[.]" (emphasis in original)). In fact, the *Guides* specifically contemplate that the claimant not receive a rating unless and until his/her condition has stabilized, is unlikely to change within the next year, and is not amenable to further medical or surgical therapy. *See id.* The passage relied upon by the majority was extrapolated from a larger discussion which elucidates that the DRE model attempts to document physiologic and structural impairments relying especially upon evidence of neurologic deficits and uncommon, adverse structural changes according to clinical findings that are verifiable using standard medical procedures. In the same context, the *Guides* intend that common developmental findings which affect the general public should not be included in a DRE impairment rating, nor should changes in signs or symptoms that do not result from the injury but rather from the individual claimant's subjec-

tive response to the injury. In other words, the DRE model intends to remove from impairment consideration those conditions that vastly affect the general population, as a natural result of non-work related factors such as aging, obesity, and lethargy. The majority, however, fails to appreciate this distinction.

## C. Rule of Liberality [6]

The final mistake apparent in the majority's reasoning is in its interpretation and application of the rule of liberality in workers' compensation proceedings. Liberal interpretation has been defined as "[i]nterpretation according to what the reader believes the author *reasonably* intended, even if, through inadvertence, the author failed to think of it." Black's Law Dictionary 824 (7th ed.1999) (emphasis added). In this case, as well as in other workers' compensation cases recently handed down by this Court,[7] the majority has grossly overextended the rule of liberality, and has lost sight of the reasonableness component of the rule. Before specifically explaining how the majority has misapplied the rule of liberality in the instant case, I pause to briefly examine the history and development of the rule in our workers' compensation jurisprudence.

**6.** There are actually two applications of the liberality rule in the context of workers' compensation, one that is related to evidentiary matters, and one pertaining to the interpretation of workers' compensation statutes. *See Javins v. Workers' Comp. Comm'r,* 173 W.Va. 747, 758, 320 S.E.2d 119, 130 (1984) ("The time-honored liberality rule is not only a rule of statutory construction, but is also an evidentiary rule." (citations omitted)). This discussion addresses both.

**7.** *See State ex rel. McKenzie v. Smith,* 212 W.Va. 288, 569 S.E.2d 809 (2002), and *Skaggs v. Eastern Assoc. Coal Corp.,* 212 W.Va. 248, 569 S.E.2d 769 (2002).

**8.** *See* 1913 Acts of the Legislature, Regular Session, c. 10.

**9.** This statutory authority permitting administrative and judicial tribunals to apply the rule of liberality in workers' compensation litigation represented a sound public policy statement, particularly in consideration of the fact that when the workers' compensation system was created the Legislature required both employers *and* em-

As earlier noted, the workers' compensation system of this State was created by the Legislature in 1913.[8] At its inception, it was clearly intended that the workers' compensation scheme would be liberally construed, as is demonstrated by the following provision from the founding Act:

[The] commission shall not be bound by the usual common law or statutory rules of evidence, or by any technical or formal rules of procedure, other than herein provided, but may make the investigation in such manner as in its judgment is best calculated to ascertain the substantial rights of the parties and *to carry out justly and liberally the spirit of this act.*

1913 Acts of the Legislature, Regular Session, c. 10, § 44 (emphasis added).[9] The legislative direction to construe the workers' compensation statutes liberally was noted by this Court in *Poccardi v. Ott,* wherein the following observations were made:

The statute itself relaxes the common law and statutory rules of evidence and abolishes the technical and formal rules of procedure other than those expressly retained, and requires each claim to be investigated in such manner as may best be calculated · to ascertain the substantial rights of the parties and *justly and liberally effectuate the spirit and purpose of its*

ployees to contribute funds to the system. In this regard, the Legislature expressly provided that "[t]he commission shall establish a workmen's compensation fund from premiums paid thereto by employers and employe[e]s" 1913 Acts of the Legislature, Regular Session, c. 10, § 19. The Workmen's Compensation Act further required that "premiums provided for in this act shall ... be contributed in proportion of ninety per cent by the employers and ten per cent by the employe[e]s." 1913 Acts of the Legislature, Regular Session, c. 10, § 24. Accompanying the requirement that employees pay part of their wages into the newly developed workers' compensation system was the corresponding demand that the system's laws be justly and liberally construed in favor of those employees, and that evidentiary disputes be resolved in the employees' favor. This was so because employers were able to recoup the money they paid into the system by proportionately raising the price of their products. Employees, on the other hand, had no way of recovering the wages that were withheld from their pay. Thus, in the end, it was the employees and the general consuming public who funded the system, not the employers.

*provisions.* Its object is beneficent and bountiful, its provisions broad and generous.... Strict rules are not to obtain to the detriment of a claimant in violation of these wholesome purposes.

82 W.Va. 497, 500–01, 96 S.E. 790, 791 (1918) (emphasis added.). The above passage from *Poccardi* represents the first comprehensive statement by the Court [10] that the workers' compensation laws were to be liberally construed in favor of the employee. [11] Also incorporated in the Court's acknowledgment that the provisions of this beneficent system should be liberally applied, is the recognition that it should be employed justly, and in a manner calculated to effectuate its spirit and purpose. In other words, liberality must be tempered with reasonableness.

Within a year of the decision in *Poccardi*, however, the Legislature amended the statute and removed the word "liberal" therefrom. [12] This legislative change was observed in the case of *Whitt v. Workmen's Compensation Commissioner*, wherein it was stated in dicta that

[t]oday, there is no provision in the workmen's compensation law requiring the commissioner, the appeal board, or this Court to apply a rule of "liberality" either in construing the workmen's compensation law or appraising the evidence in a workmen's compensation case.

153 W.Va. 688, 692, 172 S.E.2d, 375, 377 (1970). [13] Despite the Legislature's omission of the liberality requirement from the work-

ers' compensation code, [14] three years later the Court nevertheless reaffirmed the liberality rule by recognizing that

[c]ompensation acts being highly remedial in character, though in derogation of the common law, should be liberally and broadly construed to effect their beneficent purpose, *State ex rel. Duluth v. District Court*, 129 Minn. 176, 151 N.W. 912 [ (1915) ]. All of the states which have passed compensation acts follow this rule of construction. Honold on Work. Comps. Sec. 6.

*Sole v. Kindelberger*, 91 W.Va. 603, 607, 114 S.E. 151, 153 (1922). However, the *Sole* Court found it unnecessary to apply the rule of liberality to resolve the issue before it, and commented further that

If there was any ambiguity in the portions of our act which have been under consideration this rule would be invoked; but we consider the language so plain in the sections noticed that it does not need the application of any rule, except that very wise one which is to the effect that "[t]here is no safer or better settled canon of interpretation than that when language is clear and unambiguous it must be held to mean what it plainly expresses." Lewis Sutherland Stat. Con., Sec. 367.

*Id.* Thus, the *Sole* Court plainly acknowledged that there are limitations to the rule of liberality, and that the rule should not be applied where statutory language is plain.

---

**10.** Although, using terms that were less precise and clear than those used in *Poccardi*, the Court had earlier *indicated* that workers' compensation laws were to be liberally construed. *See Culurides v. Ott*, 78 W.Va. 696, 700, 90 S.E. 270, 271 (1916).

**11.** In the case of *Machala v. Compensation Commissioner*, 109 W.Va. 413, 155 S.E. 169 (1930), the Court further clarified that the rule of liberality was to also be applied to construe evidentiary facts in favor of employees.

**12.** *See* 1919 Acts of the Legislature, Regular Session, c. 131, § 44, wherein it is stated:

The commissioner shall not be bound by the usual common law or statutory rules of evidence, but shall adopt formal rules of practice and procedure as herein provided, and may make investigations in such manner as in his judgment is best calculated to ascertain the

substantial rights of the parties and to carry out the provisions of this act.

**13.** It is interesting to note that at the same time it removed the word "liberal" from the workers' compensation statute, the Legislature also removed the requirement that employees had to pay a portion of their wages into the system. *See* 1919 Acts of the Legislature, Regular Session, c. 131, §§ 19 & 24 (obligating employers to fund the system exclusively). It may very well be that by not obligating employees to pay wages into the system, the Legislature felt that there was no longer a need to have workers' compensation laws and evidence interpreted liberally in favor of employees. Unfortunately, the Legislature did not explicitly state what may very well have been implicitly intended by the amendments.

**14.** The charge of liberality has never been returned to the workers' compensation statutes.

Likewise, the Court has applied the reasonableness standard when implementing the rule as an evidentiary tool. In this respect, we have said "we have a rule of law, namely the liberality rule, which mandates that *reputable* evidence favorable to the claimant be considered and the claimant treated as generously as any *reasonable* view of the evidence would justify." *Persiani v. State Workmen's Comp. Comm'r*, 162 W.Va. 230, 236, 248 S.E.2d 844, 848 (1978) (emphasis added). *See also Thacker v. Workers' Comp. Div.*, 207 W.Va. 241, 248, 531 S.E.2d 66, 73 (1999) (per curiam) (Starcher, C.J., concurring) ("Under the 'rule of liberality,' a claimant is supposed to be given the benefit of all *reasonable* inferences that can be drawn from the evidence in support of his or her claim." (emphasis added)). Other courts similarly have observed such limitations, and also have recognized the reasonableness standard that accompanies the liberality rule. Indeed, it has been said that

> liberality should not ... extend beyond the clearly expressed language of th[e] [statutes], and our courts may not enlarge the ordinary meaning of the terms used by the legislature or engage in any method of judicial legislation.... [C]onsequently, the judiciary should avoid ingrafting upon a law something that has been omitted, which [it] believes ought to have been embraced.

*Deese v. Southeastern Lawn & Tree Expert Co.*, 306 N.C. 275, 277–78, 293 S.E.2d 140, 143 (1982) (citations and internal quotation marks omitted). Additionally, "courts are not free under the guise of liberal construction to extend worker's compensation benefits ... that do not *reasonably* fall within the statute." *In re Corman*, 909 P.2d 966, 971 (Wyo.1996) (citation omitted) (emphasis added). Simply put, "liberality of construction should not proceed to such a point as to amount to judicial legislation." *Ford v. Mitcham*, 53 Ala.App. 102, 104, 298 So.2d 34, 36 (1974).

In the instant case, the majority has gone too far in the name of liberality. As I have demonstrated above, the liberality rule must be tempered by reasonableness, and must not be used as justification for improper legislating by the Court. Nevertheless, that is exactly what has been done in this case. The Legislature has clearly granted to the Commissioner the authority to establish regulations, with the approval of the Performance Council,[15] for determining an injured worker's level of medical impairment. The majority, apparently dissatisfied with this authority conferred upon the Commissioner, and further displeased with the regulations actually adopted by the Commissioner, has imposed its own judgment over that of the Legislature, the Commissioner, and the Performance Council. In so doing, the majority has rejected regulations that permitted flexibility on the part of the physicians to use the test that would most likely result in an accurate determination of the level of impairment arising from a back injury, and imposed in its stead the ROM test, which has been deemed largely unreliable by the very profession responsible for its development. There is nothing in the workers' compensation statutory scheme upon which this action may be reasonably based. The majority was obviously motivated by the goal of granting workers' compensation claimants the highest possible disability rating regardless of the realities of their medical conditions.

In the past, the Court has consistently adhered to the principle that "the liberality rule cannot be considered as taking the place of proper and satisfactory proof." *Bilchak v. State Workmen's Comp. Comm'r*, 153 W.Va. 288, 297, 168 S.E.2d 723, 729 (1969). *Accord* Syl. pt. 3, *Clark v. State Workmen's Comp. Comm'r*, 155 W.Va. 726, 187 S.E.2d 213 (1972); *Smith v. State Workmen's Comp. Comm'r*, 155 W.Va. 883, 888, 189 S.E.2d 838, 841 (1972) (per curiam); Syl. pt. 3, *Staubs v. State Workmen's Comp. Comm'r*, 153 W.Va. 337, 168 S.E.2d 730 (1969); *Dunlap v. State Workmen's Comp. Comm'r*, 152 W.Va. 359, 364, 163 S.E.2d 605, 608 (1968); *Hosey v. Workmen's Comp. Comm'r*, 151 W.Va. 172, 176, 151 S.E.2d 729, 731 (1966); Syl. pt. 1, *Deverick v. State Comp. Dir.*, 150 W.Va. 145,

---

**15.** *See supra* note 3, and accompanying text, for information about the Performance Council and its members.

144 S.E.2d 498 (1965). In the instant case, the majority has used the rule of liberality to expressly permit claimants to use faulty evidence of the extent of compensable back injuries. This unfortunate and unprecedented use of the rule of liberality will now make it virtually impossible for the Commissioner or employers to defend against inaccuracies in impairment ratings produced by the ROM model.

A member of this Court has previously explained that

> West Virginia's *Constitution* guarantees its citizens access to the courts—the workers' compensation system is constitutionally acceptable only because it is a speedier, more certain alternative to the court system due to the rule of liberality. If the rule of liberality is eliminated, citizens are deprived of access to a reasonable alternative to the courts—and therefore, the constitutionality of the workers' compensation system would be called into question.

*Thacker*, 207 W.Va. at 249, 531 S.E.2d at 74 (Starcher, C.J., concurring) (footnote omitted). What the majority fails to recognize, however, is that the constant raiding of the workers' compensation fund by unjustly increasing the amount of awards, and lowering evidentiary standards into nonexistence, creates a system so financially jeopardized and so clogged with malfeasants that workers who have suffered real injuries and who truly need such monies are deprived of the speedier, more certain route to relief the workers' compensation system was intended to guarantee. In short, "[e]xtreme justice is extreme injustice." [16]

#### D. From Magic Words to Magic Tests: The Practical Application of the Majority's Opinion

"The law is a sort of hocus-pocus science." [17] In *Lambert v. Workers' Compensation Division*, 211 W.Va. 436, 446-47, 566 S.E.2d 573, 583-84 (2002), we cautioned against the reliance on buzzwords or magic phrases in the assessment of an injured employee's degree of impairment. Although the majority seemingly echoes this refrain, ironically it does not practice what it preaches. Behind the smoke and mirrors of the Court's decision in the case *sub judice*, the majority nevertheless adopts not magic words but a magic test, the ROM model, for determining the extent of a claimant's work-related disability. Despite the majority's protestations to the contrary, the practical application of its decision will most certainly " 'open the lock' for a claimant seeking compensation." I only hope that the Legislature can uncover this illusion before the Workers' Compensation Fund is depleted to the detriment of future claimants disabled by work-related injuries.

For the foregoing reasons, I dissent. I am authorized to state that Justice Maynard joins me in this dissenting opinion.

---

**16.** Cicero, *quoted in The Lawyer's Quotation Book: A Legal Companion* 64 (John Reay–Smith ed., 1991).

**17.** Charles Macklin, *quoted in id.*, at 44.