517 S.E.2d 283

Martha E. WAGNER, Appellant,

v.

**WORKERS' COMPENSATION DIVI-SION and H.J. Thomas Memori-al Hospital, Appellees.**

No. 25051.

Supreme Court of Appeals of
West Virginia.

Submitted Sept. 16, 1998.

Decided Dec. 11, 1998.

Concurring Opinion of Justice Starcher
July 30, 1999.

Gregory W. Evers, Franklin W. Kern L.C.,
Charleston, West Virginia, Attorney for the
Appellant.

Jon Snyder, Mark S. Weiler, Miller & Snyder, Charleston, West Virginia, Attorneys for Appellee, H.J. Thomas Memorial Hospital.

PER CURIAM:

The appellant, Martha Wagner, appeals an order of the Workers' Compensation Appeal Board concluding that she suffered no additional permanent partial disability as a result of a compensable work injury she sustained on January 25, 1993. Ms. Wagner had earlier received an award of 22% for permanent partial disability resulting from a similar back injury she sustained in 1982. On appeal, Ms. Wagner argues that the Workers' Compensation Division improperly calculated her current level of permanent partial disability by subtracting from her current level of whole person medical impairment the amount of her prior permanent partial disability award, which was calculated under a different, more generous, method that accounted for true disability. After thoroughly considering the parties' arguments, the record submitted on appeal and the relevant authorities, we conclude that Ms. Wagner failed to establish that her permanent partial disability was improperly calculated. Consequently, we affirm the order of the Workers' Compensation Appeal Board.

## I.

### FACTUAL BACKGROUND

Martha Wagner [hereinafter "Wagner"], the appellant, suffered a low back injury on January 25, 1993, in the course of performing her duties as a registered nurse employed by the appellee, H.J. Thomas Memorial Hospital. After Wagner underwent a prolonged course of treatment for her injury, she was evaluated to determine if she had sustained any permanent partial disability from the January 25, 1993, injury. By order dated April 23, 1996, Wagner was notified by the Workers' Compensation Division [hereinafter "the Division"] that she would receive no

permanent partial disability award for that injury. The Division based its decision upon the April 3, 1996, report of Dr. Paul Bachwitt,[1] an orthopedist, which concluded that Wagner had no permanent disability from the injury for which she had not previously been compensated. Wagner had previously been awarded 22% permanent partial disability for a similar low back injury she incurred in 1982.

In evaluating Wagner, Dr. Bachwitt utilized the American Medical Association, *Guides to the Evaluation of Permanent Impairment* (4th ed. 1993) [hereinafter "Fourth Edition AMA Guides"], and determined Wagner's current whole person impairment to be either 10% or 15%. Under the Fourth Edition AMA Guides, to calculate the impairment caused by an injury sustained at the same location as an earlier injury, the physician first determines the patient's whole person impairment and then subtracts the amount of impairment caused by the earlier injury. The amount remaining is attributable to the newer injury. Because Wagner had previously been awarded 22% for permanent partial disability, and because her current whole person impairment was only 10% or 15%, Dr. Bachwitt opined that Wagner had no additional impairment as a result of her January, 1993, injury.[2] Wagner timely protested the April 23, 1996, order of the Workers' Compensation Division granting her no permanent partial disability.

While Wagner received medical treatment and evaluations from numerous physicians with respect to her 1993 injury, the only doctor, other than Dr. Bachwitt, to express an opinion as to her permanent level of disability was Dr. Colin Craythorne, also an orthopedist.[3] Dr. Craythorne's resulting report, dated September 9, 1996, and submitted in support of Wagner's protest, stated that, based on the Fourth Edition AMA Guides, Wagner's permanent impairment was 10% of the body as a whole. However, Dr. Craythorne noted that, although Wagner had suf-

1. Dr. Bachwitt evaluated Wagner on behalf of the Workers' Compensation Division.

2. In other words, subtracting Wagner's earlier 22% disability award from her present 10% or 15% whole person impairment results in a nega-

tive level of impairment attributable to her January 25, 1993, injury.

3. Dr. Craythorne evaluated Wagner on her own behalf.

fered a previous back injury, she had recovered reasonably well and had returned to work before sustaining her second back injury. Furthermore, Dr. Craythorne opined that Wagner's 1982 injury had very little effect on the current injury. Consequently, he recommended a 10% impairment rating irrespective of any prior award for her previous lumbar spine injury.

During a subsequent deposition, Dr. Craythorne acknowledged that the Fourth Edition AMA Guides state "[t]he percent based on the previous findings would be subtracted from the percent based on the current findings." However, Dr. Craythorne explained his position by stating his opinion that the "time interval of eleven years [between the two injuries] ... would make it remote that it [the 1982 injury] was an active condition. I think that condition was over and done with, and she had a new condition in '93." Dr. Craythorne testified further that the symptoms Wagner suffered as a result of her 1993 injury differed from the symptoms reported by an orthopedic surgeon in connection with her 1982 injury. He also opined that Wagner's symptoms and condition resulting from her second injury were more significant and worse than they had been following her 1982 injury.

As a result of Wagner's protest of the April 23, 1996, order of the Workers' Compensation Division, her claim was reviewed by the Workers' Compensation Office of Judges [hereinafter "Office of Judges"]. By order entered July 7, 1997, the Office of Judges found Dr. Craythorne's report to be unreliable "in that it fail[ed] to fully take into account that the claimant received 22% from a prior back injury, and that the effects of the injuries are difficult to separate and apportion." The Office of Judges also commented that "[t]he report of Dr. Bachwitt is deemed the more reliable medical report. Dr. Bachwitt performed his examination in accordance with the AMA Guides, which, according to his testimony and the testimony of Dr. Colin Craythorne, require that prior awards be subtracted in determining the percentage of permanent partial disability." Finally, the Office of Judges affirmed the April 23, 1996, order of the Workers' Compensation Division, and concluded:

The reliable evidence of record indicates that the claimant had previously received a 22% award for a similar injury to her back that she received in this claim.

The reliable medical evidence indicates the claimant had a 10% permanent partial disability as a result of all injuries she had received to her back.

The reliable medical evidence further indicates the claimant therefore is entitled to no permanent partial disability award as a result of the injury she received in this claim due to the requirement of the AMA Guides that prior disability awards be substracted [sic] from the latest award.

Thereafter, Wagner appealed her claim to the Workers' Compensation Appeal Board where, by order entered January 30, 1998, the order of the Office of Judges, dated July 7, 1997, was affirmed. It is the January 30, 1998, order of the Workers' Compensation Appeal Board that Wagner now appeals to this Court.

## II.

### STANDARD OF REVIEW

■ The standard we apply when reviewing the evidentiary findings of the Workers' Compensation Appeal Board has been long established:

" 'This Court will not reverse a finding of fact made by the Workmen's Compensation Appeal Board unless it appears from the proof upon which the appeal board acted that the finding is plainly wrong.' Syl. pt. 2, *Jordan v. State Workmen's Compensation Commissioner*, 156 W.Va. 159, 191 S.E.2d 497 (1972), quoting, Syllabus, *Dunlap v. State Workmen's Compensation Commissioner*, 152 W.Va. 359, 163 S.E.2d 605 (1968)." Syllabus, *Rushman v. Lewis*, 173 W.Va. 149, 313 S.E.2d 426 (1984).

Syl. pt. 1, *Conley v. Workers' Compensation Div.*, 199 W.Va. 196, 483 S.E.2d 542 (1997). Moreover, we have explained that "the plainly wrong standard of review is a deferential one, which presumes an administrative tribunal's actions are valid as long as the decision

is supported by substantial evidence." *Conley* at 199, 483 S.E.2d at 545 (citing Syl. pt 3, *In re: Queen*, 196 W.Va. 442, 473 S.E.2d 483 (1996); *Frymier–Halloran v. Paige*, 193 W.Va. 687, 695, 458 S.E.2d 780, 788 (1995)).

■ Furthermore, in determining the correctness of a decision of the Workers' Compensation Appeal Board, which affirmed a decision rendered by the Workers' Compensation Office of Judges, we are mindful that "[w]hen the Workers' Compensation Appeal Board reviews a ruling from the Workers' Compensation Office of Judges it must do so under the standard of review set out in W.Va.Code § 23–5–12(b) (1995),[4] and failure to do so will be reversible error." Syl. pt. 6, *Conley*. With due consideration of these principles, we consider the issues raised by Wagner.

## III.

## DISCUSSION

Wagner asks this Court to reverse the January 30, 1998, order of the Workers' Compensation Appeal Board, and to find her entitled to the 10% additional permanent partial disability award recommended by Dr. Colin Craythorne. In this regard, Wagner complains that the Workers' Compensation Appeal Board was plainly wrong in affirming an Office of Judges' order finding that she had no additional permanent partial disability as a result of her low back injury of January 25, 1993. According to Wagner, the finding

---

4. W.Va.Code § 23–5–12(b) (1995) (Repl.Vol. 1998) states, in part:

   [The Workers' Compensation Appeal Board] shall reverse, vacate or modify the order or decision of the administrative law judge if the substantial rights of the petitioner or petitioners have been prejudiced because the administrative law judge's findings are:
   (1) In violation of statutory provisions; or
   (2) In excess of the statutory authority or jurisdiction of the administrative law judge; or
   (3) Made upon unlawful procedures; or
   (4) Affected by other error of law; or
   (5) Clearly wrong in view of the reliable, probative and substantial evidence on the whole record; or
   (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

5. *See* W.Va.Code § 23–4–6(j) (1990) (Cum.Supp. 1991) ("The percentage of all permanent disabilities other than those enumerated in subdivision

---

of no additional permanent partial disability was erroneous because it was calculated by subtracting the amount of her earlier permanent partial disability award (22%) from her level of medical impairment that resulted from her January 25, 1993, injury (10%). Wagner argues that because the earlier award was determined under a different, more generous, standard that granted the Workers' Compensation Commissioner discretion to base a permanent partial disability rating upon a claimant's true disability,[5] subtracting her earlier percentage of disability from her current percentage of medical impairment only,[6] unfairly deprives her of disability benefits. Finally, Wagner contends that the Workers' Compensation Division retroactively applied a method of calculating medical impairment/disability that became effective after her date of injury, which violated her due process rights and resulted in a denial of her substantial rights.

■ Because Wagner asks us to adopt the recommendations of Dr. Colin Craythorne, we first consider whether the Workers' Compensation Appeal Board was plainly wrong in affirming the decision of the Office of Judges finding Dr. Craythorne's report was unreliable. In making this determination, we consider whether the decision is supported by substantial evidence, and if it is so supported, we presume its validity. *Conley* at 199, 483 S.E.2d at 545.

---

(f) of this section *shall be determined by the commissioner. . . ."* (emphasis added)). With this contention, Wagner suggests that prior to the 1995 amendments to the Workers' Compensation laws, the Commissioner could consider not only a claimant's medical impairment but also additional factors, such as how a claimant's injury affected his or her ability to work, in determining his/her percentage of permanent disability.

6. *See* W.Va.Code § 23–4–6(i) (1995) (Repl.Vol. 1998) (stating, in part, "the degree of permanent disability other than permanent total disability shall be determined exclusively by the degree of whole body medical impairment that a claimant has suffered. . . . Once the degree of medical impairment has been determined, that degree of impairment shall be the degree of permanent partial disability that shall be awarded to the claimant.").

The Office of Judges found the report of Dr. Craythorne unreliable "in that it fail[ed] to fully take into account that the claimant received 22% from a prior back injury, and that the effects of the injuries are difficult to separate and apportion." Indeed, with regard to Wagner's 1982 back injury, Dr. Craythorne stated in his report:

It is true that she [Wagner] did have a precedent back injury and required surgery back in 1982. She did reasonably well after surgery and was working at the time of her most recent injury of 1–93. I would think that the injury requiring surgery that occurred approximately 11 years prior to this [1993] injury would have had very little effect on this injury. I would recommend a 10% impairment for the injury of 1–25–93, irrespective of any prior award for a lumbar spine injury.

These comments by Dr. Craythorne reveal that he failed to consider the permanent aspects of Wager's 1982 injury. Notwithstanding the fact that it had previously been determined that Wagner was 22% *permanently* disabled as a result of her 1982 injury, Dr. Craythorne seemed to opine that in the eleven years since that accident, her *permanent* disability had cured itself and thus required no consideration, due primarily to the amount of time that had elapsed. In reaching this conclusion, he also appeared to rely on the fact that Wagner was able to return to work following her 1982 injury. A return to work is not unexpected from a claimant who has only a 22% disability. From our review of Dr. Craythorne's report, we find substantial evidence to support the decision of the Workers' Compensation Appeal Board that the report is unreliable. We therefore conclude that the Workers' Compensation Appeal Board's decision on this point is valid.

■ Having determined that Dr. Craythorne's report was unreliable, we next address Wagner's contention that subtracting the 22% permanent partial disability award she received in connection with her 1982 injury from the current estimate of her level of medical impairment was unfair because the earlier award considered factors other than mere medical impairment. We are unpersuaded by Wagner's argument. While she claims that her percentage of permanent partial disability granted in connection with her 1982 injury included more than mere medical impairment, she has provided nothing but speculation in support of this contention. Moreover, she has provided no clue as to how much of the 22% award was based on factors other than medical impairment.

We have previously explained that while "[t]he general rule in workmen's compensation cases is that the evidence will be construed liberally in favor of the claimant, ... [that] rule does not relieve the claimant of the burden of proving his [or her] claim by proper and satisfactory proof." *Linville v. State Workmen's Compensation Comm'r*, 160 W.Va. 549, 553–54, 236 S.E.2d 41, 44 (1977) (citation omitted). *Accord Anderson v. State Workers' Compensation Comm'r*, 174 W.Va. 406, 409 n. 4, 327 S.E.2d 385, 388 n. 4 (1985) (citing *Linville* ). Because Wagner failed to show what portion, if any, of her 22% permanent disability rating arose from factors other than medical impairment, she failed to establish that it was improper to subtract the full 22% from her present percentage of medical impairment.

The only reliable medical evidence regarding her present medical impairment was provided by Dr. Bachwitt. In his report, Dr. Bachwitt indicated that Wagner's present percentage of whole person medical impairment is 10% or 15%. In his deposition, Dr. Bachwitt testified that because the 1982 and 1993 injuries occurred at the same location, the percentage of impairment that resulted from the earlier injury must be subtracted from the current percentage of impairment in order to ascertain the amount of impairment that resulted from the later injury.[7] Dr. Bachwitt then properly subtracted the 22% permanent disability rating Wagner had already been awarded from her present percentage of whole person medical impairment and recommended a 0% whole person impairment.[8] Because the only reliable medical

---

7. Dr. Bachwitt testified that he believed this procedure was consistent throughout all the editions

of the American Medical Association, *Guides to the Evaluation of Permanent Impairment.*

8. There was no evidence in the record to show

evidence recommended 0% whole person impairment, the Commissioner did not apply any law, past or present, to determine disability. Thus, we need not reach Wagner's argument that the Commissioner retroactively applied a method of calculating her permanent partial disability that became effective after her date of injury.

## IV.

## CONCLUSION

For the foregoing reasons, the January 30, 1998, decision of the Workers' Compensation Appeal Board is affirmed.

Affirmed.

Justice McCUSKEY and Justice McGRAW did not participate in the decision of this case.

STARCHER, Justice, concurring:

(Filed July 30, 1999)

The claimant-appellant in this case makes a compelling argument that the Workers' Compensation Division, when making disability determinations, unfairly compares disability calculations under the pre–1995 workers' compensation statutes to impairment calculations made after 1995 under the American Medical Association's *Guides to the Evaluation of Permanent Impairment, Fourth Edition* (1993). Doing so is certainly a comparison of apples and oranges.

Unfortunately, I agree with the conclusion reached by the majority in this case that the claimant doesn't have a case, because there is no evidence in the record to tell us how the claimant was affected by this method of determining disability. I write to make clear that, given the evidence, this Court may reconsider the argument in the future.

Prior to the Legislature's amendments in 1995, the Workers' Compensation Act distinguished between impairment, which is a medical question, and disability, which is a legal question. To determine impairment, a doctor would examine the claimant and render a scientific opinion regarding how much a claimant's physical functions were impaired by a work-related injury. The Workers' Compensation Commissioner would then determine disability by looking at the doctor's opinion on impairment, and mix that opinion with the evidence of the claimant's earning capacity, the effect of the impairment on the claimant's efficiency at work, and the effect of the impairment on the claimant's pursuit of normal everyday living. From a mix of these factors, the Commissioner would compute the claimant's percentage of permanent partial disability. The Commissioner's permanent partial disability award would, in theory, only partially take into account the doctor's determination of impairment.[1]

In 1995 the Legislature amended *W.Va. Code*, 23–4–6(i) to state that "the degree of permanent disability other than permanent total disability shall be determined exclusively by the degree of whole body medical impairment that a claimant has suffered." This amendment altered the Workers' Compensation Act in two ways significant to this case. First, after 1995 doctors are to make impairment evaluations using a standardized, "whole body" impairment rating system—in other words, they are to use the American Medical Association's *Guides to the Evaluation of Permanent Impairment, Fourth Edition* (1993). Second, the Commissioner is to make permanent partial disability awards solely on the basis of the doctor's impairment evaluation. Put another way, the percentage of medical impairment now equals the per-

that Dr. Bachwitt's recommendation of 0% whole person impairment would have been different had it been rendered pursuant to a different medical standard in use at the time of Wagner's 1993 injury.

1. As we have stated repeatedly through the years:

In determining the percentage of disability for a workmen's compensation claimant, consideration must be given to the impairment of the employee's earning capacity, to the effect of possible impairment of his efficiency at

work, and the impairment to the normal pursuit of everyday living.

Syllabus Point 2, *Posey v. State Workmen's Compensation Comm'r,* 157 W.Va. 285, 201 S.E.2d 102 (1973). *See also, Haines v. Workmen's Compensation Comm'r,* 151 W.Va. 152, 150 S.E.2d 883 (1966); *McGeary v. State Compensation Director,* 148 W.Va. 436, 135 S.E.2d 345 (1964); *Kamensky v. State Compensation Commissioner,* 148 W.Va. 258, 134 S.E.2d 582 (1964).

192

centage of permanent partial disability, and the Commissioner cannot take into consideration any other factors.

This method of calculating permanent partial disability is particularly harsh on a claimant. "Impairment" is a cold, scientific measurement of the permanent effect an injury has on the body. It is a medical issue assessed by medical means. An impairment is a "condition[ ] that interfere[s] with an individual's 'activities of daily living.' " *Guides*, 1/1. Those activities include self-care and personal hygiene, eating and preparing food, communication, maintaining one's posture while sitting or standing, walking or moving about, and recreational and work activities. *Id.* The degree of impairment is simply "an informed estimate of the degree to which an individual's capacity to carry out daily activities has been diminished."

Disability is a discretionary measurement of the effect that an impairment has on the claimant's job and lifestyle. The *Guides* define "disability" in the following manner:

Disability may be defined as an alteration of an individual's capacity to meet personal, social, or occupational demands, or statutory or regulatory requirements, because of an impairment. Disability refers to an activity or task the individual cannot accomplish. A disability arises out of the interaction between impairment and external requirements, especially those of a person's occupation. Disability may be though of as the gap between what a person *can* do and what the person *needs* or *wants* to do.

*Id.* at 1/2.

The American Medical Association (and prior to 1995, the Workers' Compensation Act) considers "impairment" and "disability" to be entirely separate terms. The *Guides* states:

An "impaired" individual is not necessarily "disabled." For example, loss of the distal phalanx of the little finger of the right hand will impair the functioning of the digit and hand of both a concert pianist and a bank president. However, the bank president is less likely to be disabled than the pianist. A surgeon who loses a hand will be impaired and will be disabled in terms of the ability to operate; but the

surgeon may be fully capable of being the chief of a hospital medical staff and may not be at all disabled with respect to that occupation.

Hence, according to the American Medical Association the same degree of "impairment" calculated according to the *Guides* can create a different degree of "disability" depending upon the circumstances of different impaired individuals.

Because of this distinction between "impairment" and "disability," the American Medical Association recognizes that the *Guides* are not suitable for making disability determinations, and should only be used to calculate medical impairment. The AMA's *Guides* themselves state, in bold text:

**It must be emphasized and clearly understood that impairment percentages derived according to *Guides* criteria should not be used to make direct financial awards or direct estimates of disabilities.**

*Guides* at 1/5. The American Medical Association made clear that the impairment formulas in the *Guides* should *not* be used "to calculate the percentage by which the employee's industrial use of the body is impaired." *Id.* at 1/4. Instead, the American Medical Association states that:

... each commissioner or hearing official must come to a conclusion [as to the level of disability] on the basis of assessment of the available medical and nonmedical information. The *Guides* may help resolve such a situation, but it cannot provide complete and definitive answers.

*W.Va.Code*, 23-4-6(i) [1995] ignores this advice, and mandates that the Commissioner make disability determinations solely on the medical information without regard to any nonmedical information.

The Legislature has created a formula for permanent partial disability that fails to account for the claimant's earning capacity, the effect of the impairment on the claimant's efficiency at work, and the effect of the impairment on the claimant's pursuit of everyday living. I therefore believe that a permanent partial disability award for an injury prior to 1995, when such lifestyle factors were considered, and an impairment rating under the *Guides* for an injury or aggrava-

tion after 1995, should not be compared.[2] However, in order for this Court to be able to grant a claimant any relief, the claimant must show how different the pre–1995 apples are from the post–1995 oranges, and there must be evidence in the record to show how the claimant was adversely affected by this change in the method of calculating permanent partial disability.

2. There is another reason that percentages of permanent partial disability before and after 1995 should not be compared. The *Guides* calculates impairment as a measure of the effect that an injury has on the "whole body." If a person already has some impairment, then the new impairment is measured against that person's impaired whole body—in other words, successive identical injuries receive lower impairment ratings.

Take this example: a worker crushes his right index finger, and loses 100% use of the finger. Applying the *Guides*, the worker would have an 11% "whole body" impairment. *Guides*, 3/18–3/20.

Say that worker then crushes his left index finger, and again loses 100% use of the finger. Adding that left hand injury to the first right hand injury, the worker would now have a whole body impairment of 21%—or, in other words, 10% additional impairment. Identical fingers, identical injuries, but less impairment. *Id. See also Guides*, Combined Values Chart, pp. 322–324.

Say that same worker also lost a middle finger. In the absence of any other preexisting injury, under the *Guides* the worker would have received an 11% impairment rating. But, because the worker is missing his right and left index fingers, the middle finger impairment would be measured against the existing 21% whole body impairment. The worker would, under the *Guides*, be entitled to a total whole body impairment of 30%—or 9% for the new middle finger injury. *Id.*

The *Guides* recognizes that "a 95% to 100% whole-person impairment is considered to represent almost total impairment, a state that is approaching death." *Guides*, 2/8. Put another way, the *Guides* equates "permanent total disability" with death. The more impaired a person is, the closer they are to death, and their new injuries and impairments are less significant.

The Legislature could not have seriously understood this effect of adopting the *Guide* when it enacted *W.Va.Code*, 23–4–6(i). Hence, disability ratings before 1995 and impairment ratings after 1995 cannot be fairly compared.