IN THE INTERMEDIATE COURT OF APPEALS OF WEST VIRGINIA

2022 Fall Term

_____

No. 22-ICA-10
_____

FILED

**December 9, 2022**

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
INTERMEDIATE COURT OF APPEALS
OF WEST VIRGINIA

DAVID DUFF, II,
Claimant Below, Petitioner,

v.

KANAWHA COUNTY COMMISSION,
Employer Below, Respondent.

_____

Appeal from Workers' Compensation Board of Review

(JCN: 2021000317)


AFFIRMED

_____

Submitted: November 10, 2022
Filed: December 9, 2022

William B. Gerwig, III, Esq.                    H. Dill Battle, III, Esq.
Attorney-At-Law                                 Charity K. Lawrence, Esq.
Charleston, WV                                  Spilman, Thomas & Battle
Counsel for Petitioner                          Charleston, WV
                                                Counsel for Respondent


JUDGE SCARR delivered the Opinion of the Court.

SCARR, Judge:

David Duff, II appeals the final order of the Workers' Compensation Board of Review dated July 26, 2022, granting him a 13% permanent partial disability (PPD) award. This award reflected an apportionment for preexisting impairment related to degenerative changes of the lower back, allocating roughly equal percentages to his preexisting condition and current injury. Mr. Duff contends that it was impermissible to apportion impairment between his compensable injury and preexisting back condition without sufficient medical information which could be used to derive an impairment rating for the preexisting condition pursuant to the American Medical Association (AMA), Guides to the Evaluation of Permanent Impairment (4th ed. 1993). Specifically, in order to apportion for preexisting impairment, a medical evaluator must use specific range of motion measurements or a ratable diagnosis or procedure obtained before a compensable injury. Without such information, it was arbitrary to allocate roughly equal percentages of his PPD to a preexisting condition (12%) and his compensable injury (13%).

Thus, this appeal presents two issues related to apportionment for preexisting conditions when determining PPD. First, what type of information is needed in order to ascertain and apportion impairment when determining PPD. Second, whether it is arbitrary to apportion roughly half of a claimant's impairment to preexisting conditions without quantifiable information, such as a prior PPD award, a ratable condition or procedure that would yield a percentage from a table, or pre-injury range of motion measurements from

2

which a percentage of impairment could be calculated. For reasons stated below, we hold that:

1. "Definitely ascertainable" and "definitely ascertained" for purposes of our workers' compensation statute, West Virginia Code § 23-4-9b (2003), refer to the existence of a preexisting condition, and not to the precise degree of impairment to be apportioned.

2. Quantifiable information, such as pre-injury range of motion measurements, prior permanent partial disability awards, or pre-injury conditions or procedures that would yield a percentage of impairment from a Table, is not always required to apportion impairment, as long as there is a reasonable basis for apportionment based on other competent evidence.

3. Whether preexisting degenerative changes of the spine would qualify for an impairment rating using either the Range of Motion Model or West Virginia Code of State Rules Tables 85-20-C, D or E is not the standard for whether those changes can be ascertained and then apportioned.

Accordingly, we affirm the decision of the Board of Review (Board). Nonetheless, the record in this case illustrates the need for physicians to identify and carefully explain the basis for their apportionment decisions, leading us to offer some guidance for future evaluations.

3

# I. Facts and Procedural History

Mr. Duff, a Deputy Sheriff employed by Respondent Kanawha County Commission (County Commission), injured his low back, left hip, and pelvis while helping to lift an approximately 150-pound bomb detector robot from the back of a truck on June 15, 2020. The claim administrator held the claim compensable for lumbar, left hip, pelvis, and sacrum strains, and by order dated September 24, 2020, authorized lumbar spinal fusion surgery. Pursuant to this authorization, Robert Crow, M.D., performed L3-4 posterior lumbar interbody fusion surgery to address L3-4 radiculopathy related to a left L3-4 foraminal and extraforaminal disc herniation.

Post-surgically, the claim administrator referred Mr. Duff to Prasadarao Mukkamala, M.D., for an independent medical examination (IME). On June 9, 2021, Dr. Mukkamala reported that Mr. Duff had an 8% whole person impairment (WPI) for lost range of motion, a 12% WPI based on diagnostic criteria found in AMA Table 75, Section IV-D, and a 3% WPI for weakness of the left quadriceps. Combining these impairments, Dr. Mukkamala diagnosed a 21% WPI pursuant to the Range of Motion Model of the AMA Guides, Fourth Edition. However, because Mr. Duff had spinal fusion surgery for a herniated disc, he satisfied the diagnostic criteria for Category V of West Virginia Code of State Rules (CSR) Table § 85-20-C, and the minimum award for claimants who satisfy those diagnostic criteria is 25%. Dr. Mukkamala adjusted his award to 25%, but then recommended apportioning 12% of Mr. Duff's WPI rating to preexisting degenerative

changes[1] and 13% to the compensable injury.[2] By Order dated June 17, 2021, the claim administrator granted Mr. Duff a 13% PPD award which he protested.

Bruce Guberman, M.D., examined Mr. Duff on July 28, 2021, finding a 14% WPI for lost range of motion, a 12% WPI pursuant to Table 75, Section IV-D, and a 1% WPI for sensory abnormalities found primarily in the distribution of the left L4 nerve root. Dr. Guberman combined these findings for a total WPI rating of 25%, which fit into the minimum award permitted in CSR Table § 85-20-C, Lumbar Spine Category V. He recommended that Mr. Duff receive the 25% minimum award without any apportionment. Dr. Guberman acknowledged MRI studies evidencing degenerative disc disease which was present before the current injury, but opined that apportionment was not required because Mr. Duff would not have qualified for any impairment rating for those degenerative changes using either the Range of Motion Model or Table § 85-20-C prior to his lifting

---

[1] An MRI taken about a month after the lifting accident showed, among other things, multiple levels of mild lumbar disc degeneration.

[2] Dr. Mukkamala's report does not indicate how he decided to more or less evenly split the difference between the preexisting degenerative changes and the compensable injury, but Mr. Duff alleges that the doctor routinely apportions half in cases where there is no objective evidence of prior impairment, such as pre-injury range of motion studies. In support of this statement, Mr. Duff refers to deposition testimony given by Dr. Mukkamala in another workers' compensation case which allegedly shows that that the doctor routinely divides impairments in half in cases with scant evidence of preexisting impairment.

injury.[3] According to Dr. Guberman's report, Mr. Duff had occasional lumbar pain pre-injury, but his symptoms did not radiate into his legs. Furthermore, Dr. Guberman found that Mr. Duff's prior back symptoms did not cause significant interference with his ADLs (activities of daily living), functional limitations, or interfere with his ability to work.[4] Therefore, Dr. Guberman did not apportion any share of impairment to Mr. Duff's preexisting lumbar condition. Finally, Dr. Guberman opined that Dr. Mukkamala's decision to apportion 12% WPI to mild degenerative changes was not appropriate, observing that Dr. Mukkamala offered no rationale for that percentage split.

David Soulsby, M.D., examined Mr. Duff on December 1, 2021, finding an 11% WPI for lost range of motion, a 12% WPI pursuant to Table 75, Section IV-D, and a 2% WPI due to persistent radiculopathy. Dr. Soulsby combined these impairments to total a 25% WPI. He then recommended apportionment on the basis that in his opinion the degenerative disc disease will cause lost motion and contribute to observed impairment. Dr. Soulsby also noted that preexisting degenerative disc disease increases the possibility that a disc herniation will occur and that "there is a reasonable medical probability that the

---

[3] Under our holding today, this would not preclude finding and apportioning some degree of impairment for preexisting condition(s) provided that there was other competent evidence.

[4] Dr. Guberman does not appear to have reviewed the pre-injury records from McKinney Family Chiropractic (McKinney) which document some impairment prior to the compensable injury. To be fair, we also observe that Dr. Mukkumala does not list the pre-injury reports from McKinney as material he reviewed, although he did make an effort to apportion for Mr. Duff's preexisting back condition.

disc herniation in question would not have occurred in the absence of spondyloarthropathy." Furthermore, Dr. Soulsby stated that loss of motion seen in an uninjured portion of Mr. Duff's body (the cervical spine) demonstrated that apportionment was required for the lower back, although acknowledging that it could not "be assumed that the cervical spine represents a reasonable approximation of the preexisting disease in the lumbar spine."

Dr. Soulsby further opined that "approximately 50% of the observed impairment should be apportioned to the preexisting disease process." Although Dr. Soulsby did not explain mathematically how he estimated the apportionment at approximately 50/50, he did discuss the available imaging which he indicated established preexisting degenerative changes and the records from McKinney which he believed documented, among other things, "segmental and somatic dysfunction of the lumbar region with radiculopathy," which "was symptomatic and required medical treatment."

In addition to the reports by Dr. Mukkamala and Dr. Soulsby, the County Commission introduced various medical records, including records from McKinney predating the compensable injury, which relate a nearly 20-year history of back symptoms. The McKinney records provide the best evidence of any preexisting, symptomatic condition, so we shall review some of them in detail:

- Mr. Duff was first seen at McKinney on September 26, 2018, with the initial visit note stating in pertinent part that: "Subjective: Mr. DUFF presents today and states that [he is] having a lot of back pain and stiffness in his legs and difficult to perform [activities of daily living]."

- The Confidential Health History dated September 26, 2018, states that Mr. Duff has low back pain and stiffness, and that he first noted symptoms "when he started working [in] 1999." In the "History of Occurrence" section, it states that Mr. Duff "[h]as had back pain for the last 19 yrs."

- Under "Complicating Factors," the pre-injury treatment notes repeatedly indicate that "[Mr. Duff's] current condition is complicated by the following factors which may require an increase in treatment time and frequency: degenerative disc disease…."

- Under "Short Term Goals," the pre-injury treatment notes repeatedly state that "Our goals of continued treatment include the following: improve thoracolumbar ROM by 50%, decrease pain & restore ROM, to improve [activities of daily living] without pain."

- The treatment note for May 1, 2020, about 6 weeks prior to the compensable injury, indicates that Mr. Duff was complaining of pain with a score of 6 on a scale of 10. It also relates that "[a]ctive trigger points were discovered in the mid thoracic, lower thoracic, upper thoracic, lumbar, sacral and left sacroiliac regions."

By decision dated July 26, 2022, the Board affirmed the claim administrator's decision granting the 13% PPD award, based primarily on Dr. Mukkamala's report and records from McKinney which predated the compensable injury. The Board indicated that it disregarded Dr. Soulsby's report because a low back examination form was not attached to the report as required by West Virginia Code of State Rules § 85-20-66.2 (2006).[5] Regarding Dr. Guberman's report, the Board found that it was incomplete because apportionment was necessary based on the pre-injury records from McKinney. In rejecting the argument that Dr. Mukkamala's apportionment of 12% was arbitrary, the Board noted that no other valid medical opinion allowing apportionment had been submitted which refuted Dr. Mukkamala's opinions. Furthermore, having determined that apportionment was appropriate, Dr. Mukkamala's report was most consistent with the evidentiary record,[6] including the medical records from McKinney predating the compensable injury and the MRI imaging showing preexisting degenerative changes.

---

[5] W. Va. Code R. § 85-20-66.2 provides that: "A report and opinion submitted regarding the degree of permanent whole body medical impairment as a result of a back injury without a completed back examination form shall be disregarded." The County Commission argues that only some portions of the report and opinion must be disregarded, and that the Board and this Court can consider the remaining portions. We need not resolve this question, however, because we find that the evidence of record, even without Dr. Soulsby's report, was sufficient to sustain the Board's ruling.

[6] We might be in a different posture on appeal if Dr. Guberman had apportioned (which was necessary in this case) and arrived at a different apportionment percentage from that reached by Dr. Mukkamala. It is entirely possible that the Board would have reached a different result regarding the percentage of impairment attributable to preexisting conditions if it had been presented with a second report which recognized the need to apportion, and had attempted to do so, producing a different percentage of preexisting impairment than Dr. Mukkumala. Dr. Mukkumala's report, although it did apportion,

Mr. Duff has now appealed from the Board's decision, arguing that apportionment was speculative and unreasonable without Range of Motion Model data for his preexisting condition, previous award(s), or a ratable diagnosis or procedure, and therefore he should have received the minimum impairment rating of 25% prescribed by West Virginia Code of State Rules § 85-20-C, Category V for claimants undergoing surgical spinal fusion.

## II. Standard of Review

The Intermediate Court of Appeals may affirm the order or decision of the Workers' Compensation Board of Review or remand the case for further proceedings. It shall reverse, vacate, or modify the order or decision of the Workers' Compensation Board of Review, if the substantial rights of the petitioner or petitioners have been prejudiced because the Board of Review's findings are:

(1) in violation of statutory provisions;
(2) in excess of the statutory authority or jurisdiction of the Board of Review;
(3) made upon unlawful procedures;
(4) affected by other error of law;
(5) clearly wrong in view of the reliable, probative, and substantial evidence on the whole record; or
(6) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

W. Va. Code § 23-5-12a(b) (2022). Questions of law arising in decisions issued by the Board are reviewed de novo. *Justice v. West Virginia Office Insurance Comm'n*, 230 W.

would have been more compelling and helpful if it had discussed the pre-injury treatment records from McKinney.

10

Va. 80, 83, 736 S.E.2d 80, 83 (2012). "[T]he plainly wrong standard of review is a deferential one, which presumes an administrative tribunal's actions are valid as long as the decision is supported by substantial evidence. Syl. pt 3, *In re: Queen,* 196 W.Va. 442, 473 S.E.2d 483 (1996); *Frymier–Halloran v. Paige,* 193 W.Va. 687, 695, 458 S.E.2d 780, 788 (1995)." *Conley v. Workers' Comp. Div.,* 199 W.Va. 196, 199, 483 S.E. 2d 542, 545 (1997). *See also SWVA, Inc., v. Office of Ins. Comm'n,* 222 W. Va. 435, 438, 664 S.E. 2d 776, 779 (2008) (per curiam) ("[As] *Conley* instructs, this Court must presume that the BOR's actions are valid if supported by substantial evidence.").

### III. Discussion

Mr. Duff argues that apportioning impairment related to preexisting conditions requires specific range of motion findings, ratable diagnoses or procedures, or permanent partial disability awards obtained before a compensable injury. However, our review of West Virginia's workers' compensation statutes, regulations and precedents finds no such requirement.

### A. Workers' Compensation Statutes and Regulations

Mr. Duff argues that West Virginia Code § 23-4-9b (2003) prohibits apportionment for preexisting conditions when assessing permanent impairment unless the preexisting condition is "definitely ascertainable" using the Range of Motion Model of the AMA Guides, 4th Edition. In the present case, he also argues that it was unreliable and

11

speculative to assign roughly half of the impairment to preexisting conditions without such data. We begin our analysis with a review of the applicable statutes and regulations.

Our workers' compensation apportionment statute provides, in pertinent part, that:

> Where an employee has a **definitely ascertainable impairment** resulting from an occupational or a nonoccupational injury, disease, or any other cause, whether or not disabling, and the employee thereafter receives an injury in the course of and resulting from his or her employment, unless the subsequent injury results in total permanent disability within the meaning of section one [§23-3-1], article three of this chapter, **the prior injury, and the effect of the prior injury, and an aggravation, shall not be taken into consideration in fixing the amount of compensation** allowed by reason of the subsequent injury.

W. Va. Code § 23-4-9b (2003) (emphasis added).

However, this section also states that:

> Nothing in this section requires that the degree of the preexisting impairment be **definitely ascertained** or rated prior to the injury received in the course of and resulting from the employee's employment or that benefits must have been granted or paid for the preexisting impairment. The degree of the preexisting impairment may be established at any time by **competent medical or other evidence.**

*Id.* (emphasis added).

A major disagreement in this case turns on what it means for a preexisting impairment to be "definitely ascertainable" or "definitely ascertained," with Mr. Duff

12

arguing that, subject to some limited exceptions, there must be pre-injury range of motion data from which impairment can be calculated and apportioned,[7] although the percentage of impairment for a preexisting condition need not have been calculated in the past. We conclude that "definitely ascertainable" and "definitely ascertained" refer to the existence of a preexisting condition, and not to the precise degree of impairment to be apportioned.

Mr. Duff points out that West Virginia Code § 23-4-6(i) provides that the "workers' compensation commission shall adopt standards for the evaluation of claimants and the determination of a claimant's degree of whole body impairment." These standards are set out in regulations such as West Virginia Code of State Rules § 85-20-65.1 (2004), which states that:

> Except as provided for in section 66 of this Rule, on and after the effective date of this rule all evaluations, examinations, reports, and opinions with regard to the degree of permanent whole body medical impairment which an injured worker has suffered shall be conducted and composed in accordance with the "Guides to the Evaluation of Permanent Impairment," (4th ed. 1993), as published by the American Medical Association.

Although this regulation refers to the AMA Guides, it also makes clear that it is not necessary to fully comply with the Guides in all circumstances, stating that:

> If in any particular claim, the examiner is of the opinion that the Guides or the section 64 substitutes cannot be appropriately applied or that an impairment guide established by a recognized medical specialty group may be more appropriatly

---

[7] Mr. Duff acknowledges that apportionment for preexisting conditions would be permissible where there was a prior award of PPD fixing the percentage of impairment.

13

applied, then the examiner's report must document and explain the basis for that opinion. Deviations from the requirements of the Guides or the section 6 substitutes shall not be the basis for excluding evidence from consideration. Rather, in any such instance such deviations shall be considered in determining the weight that will be given to that evidence….

*Id.* Furthermore, as the language of this regulation indicates, deviation from the requirements of the AMA Guides is not a basis for excluding evidence, although failure to fully comply with the requirements of the Guides shall be considered in determining what weight shall be given to an examiner's opinion. West Virginia Code of State Rules § 85-20-66.4 (2006) concerning evidentiary requirements states that:

> To the extent that factors other than the compensable injury may be affecting the injured worker's whole body medical impairment, the opinion stated in the report must, to the extent medically possible, determine the contribution of those other impairments whether resulting from an occupational or a nonoccupational injury, disease, or any other cause.

Mr. Duff relies heavily on the following language from the AMA Guides, 4th ed.:

> The physician should assess the current state of the impairment according to the criteria in the *Guides*. Valid assessment of a change in impairment estimate would depend on the reliability of the previous estimate [of impairment] and the reliability of the evidence on which it was based. If there were no previous evaluation, information gathered earlier could be used to estimate impairment according to *Guides* criteria. However, if there were insufficient information to document the change accurately then the evaluator ought not to attempt the change, but should explain that decision.

AMA, *Guides to the Evaluation of Permanent Impairment* at 9–10 (4th ed. 1993). In the case at bar, we cannot say that the Board was clearly wrong in accepting Dr. Mukkumala's apportionment. After reviewing Dr. Mukkumala's report and the medical

14

records submitted, the Board concluded that "[t]he evidence on record indicates that apportionment should occur and is proper" and that "the records do establish a preexisting back condition with a definite ascertainable functional impairment." The evidence of record, including Dr. Mukkumala's report, the MRI imaging, and the treatment records from McKinney Family Chiropractic, taken together, was sufficient to support apportionment.

Although the Range of Motion Model may be used in determining impairment from preexisting conditions, it is not the only way of estimating impairment for purposes of apportionment. Requiring such data in every instance would preclude apportionment in most cases, and would be contrary to the directive of West Virginia Code § 23-4-9b that "the prior injury… shall not be taken into consideration in fixing the amount of compensation allowed by reason of the subsequent injury." *See also* W. Va. Code R. § 85-20-66.4. Furthermore, West Virginia Code § 23-4-9b provides that "[t]he degree of the preexisting impairment may be established at any time by competent medical or other evidence." In other words, West Virginia Code of State Rules § 85-20-65.1 clearly contemplates that impairment may be calculated in some cases without using the AMA Guides, stating that "[i]f in any particular claim, the examiner is of the opinion that the Guides… cannot be appropriately applied…, then the examiner's report must document and explain the basis for that opinion." Deviation from the Guides does not justify

15

excluding evidence from consideration; instead "such deviation shall be considered in determining the weight that will be given to that evidence." *Id.*

## B. Supreme Court Decisions

The Supreme Court of Appeals of West Virginia has previously recognized that radiographic evidence of degenerative changes alone is not sufficient to allow apportionment for preexisting injury. There must be something more, some evidence of a detrimental effect on work or the activities of daily living. Where such evidence of impairment is lacking, the Court has found that apportionment was not appropriate. *See Galaxy Distribution of WV, Inc. v. Spangler*, No. 19-0803, 2020 WL 6559079 (W. Va. Nov. 6, 2020) (memorandum decision) (unanimous decision) (the Board did not err in finding that apportionment was arbitrary and speculative where preexisting changes to right shoulder did not appear to affect the claimant's work or daily activities); *Minor v. West Virginia Division of Motor Vehicles*, No. 17-0077, 2017 WL 6503113, at *2 (W. Va. Dec. 19, 2017) (memorandum decision) (3-2 decision reversing Board of Review decision apportioning for preexisting condition) ("While the 2004 x-ray may have shown degenerative changes [to the right knee], those changes did not appear to affect Mr. Minor's ability to work or his activities of daily living. Therefore, we agree with the Office of

16

Judges' findings that … apportionment of the impairment rating due to the 2004 x-ray was improper….").[8]

Apportionment has been upheld, however, where preexisting changes were symptomatic prior to the compensable injury. *See Shepherd v. Cornerstone Interiors*, No. 21-0407, 2022 WL 4299586 (W. Va. Sept. 19, 2022) (memorandum decision) (upholding an apportionment of roughly half of the claimant's impairment to preexisting degenerative changes (spondyloarthropathy), as shown by imaging, where the claimant also had been undergoing pain management for those conditions prior to his compensable injury).[9]

There is no binding authority in West Virginia to support the contention that apportionment for preexisting conditions always requires pre-injury range of motion data, which is often, if not usually, unavailable.  In fact, even prior to the *Shepherd* decision, the Court upheld an apportionment of roughly one half to preexisting conditions based on

---

[8] As the AMA Guides note, radiographic changes do not necessarily reflect impairment. *See* AMA, *Guides to the Evaluation of Permanent Impairment* at 99 (4th ed., 1993) ("Roentgenographic evidence of aging changes in the spine, called osteoarthritis, are found in 40% of people by age 35 years, and there is a poor correlation with symptoms…").

[9] Under the AMA Guides, there is no impairment unless a condition or injury interferes with activities of daily living such as "self-care and personal hygiene; eating and preparing food; communication, speaking, and writing; maintaining one's posture, standing, and sitting; caring for the home and personal finances; walking, traveling, and moving about; recreational and social activities; and work activities." *Wagner v. Workers' Comp. Div.*, 205 W.Va. 186, 192, 517 S.E.2d 283, 289 (1999) (per curiam) (Starcher, J., concurring) (quoting AMA, *Guides to the Evaluation of Permanent Impairment* at 1 (4th ed., 1993)).

imaging studies and medical records predating the compensable injury. *See Epling v. Chancellor Health Partners, Inc.*, No. 20-0941, 2022 WL 855689 (W. Va. March 23, 2022) (memorandum decision). In *Epling*, the Court considered a case where preexisting degenerative changes of the lumbar spine required apportionment. *Id.* Dr. Mukkamala found a 7% impairment based on range of motion loss and apportioned 3% (roughly half) to preexisting changes. *Id.* at *2. Dr. Guberman examined the patient and found an impairment of 8% but did not make any apportionment, even though there was evidence of preexisting changes in imaging studies, because he believed the claimant would not have received an impairment for such condition prior to the compensable injury. *Id.* Furthermore, according to the Court's opinion:

> [Dr. Guberman] also stated that there is no medically objective way to calculate an impairment rating prior to the compensable injury. The Office of Judges concluded that the AMA *Guides* allow for the estimate of preexisting impairment so long as such estimate is made based on accurate historical information.

*Id.* The Office of Judges affirmed the claim administrator's grant of a 4% PPD which represented a 7% impairment based on range of motion loss minus 3% for preexisting degenerative conditions. The Board adopted the findings and conclusions of the Office of Judges, and the Supreme Court, in turn, agreed "with the reasoning and conclusions of the Office of Judges as affirmed by the Board of Review." *Id.* at *3. The Supreme Court went on to say that:

> A preponderance of the evidence indicates that Ms. Epling's impairment rating should be apportioned for her preexisting lumbar spine conditions. Ms. Epling's preinjury imaging and

18

> treatment records support Dr. Mukkamala's apportionment and impairment rating. Dr. Guberman's report was unreliable because he failed to apportion for the preexisting lumbar spine conditions.

*Id.* The results in *Epling* and *Shepherd* support our conclusion that the result in this case was neither contrary to law nor clearly wrong.

## C. The Board Did Not Commit Legal Error and Was Not Clearly Wrong

No one disputes that Mr. Duff had some preexisting degenerative changes as documented by MRI imaging. Although Mr. Duff's preexisting degenerative changes do not seem to have prevented him from working, or limited his ability to perform his work-related duties, the records from McKinney indicate that pain was affecting his ability to perform the activities of daily living, and the fact that his chiropractor listed improving thoracolumbar range of motion by 50% as a treatment goal supports a finding of some significant loss of motion and therefore impairment. As the Board concluded in its decision:

> The evidence on record indicates that apportionment should occur and is proper. The records of McKinney Chiropractor dated up to less than two months before the compensable injury, establish almost a two year history of low back pain and treatment consisting of approximately 30 office visits. The records report a lumbar diagnosis and show a loss of ROM due to the preexisting back condition as evidenced by the treatment goal to improve and restore his ROM. Thus, the records do establish a preexisting back condition with a definite ascertainable functional impairment.

19

As noted above, Mr. Duff treated with McKinney for almost two years prior to the compensable injury, and he had a history of complaints of back pain going back 19 years before the injury involved in this case.

In its order, the Board addressed the charge that Dr. Mukkamala's apportionment of 12% WPI to preexisting conditions was arbitrary, noting that no medical opinion which apportioned impairment refuted Dr. Mukkamala's amount of apportionment. Given that some degree of apportionment was required, Dr. Mukkamala's report, although not perfect, was most in keeping with the evidentiary record, and therefore, most consistent with the AMA Guides.[10]

Mr. Duff also argues that impairment from a preexisting condition should not vary depending on the amount of PPD. In other words, if a preexisting condition causes a 10% impairment, then 10% should be subtracted from the PPD to find the amount of impairment resulting from the compensable impairment. If the amount for preexisting conditions is arbitrarily set at half of the PPD determined after a compensable injury,

---

[10] We recognize that Dr. Mukkumala's report was not a perfect example of the sort of detailed and explanatory report which physicians should be submitting in workers' compensation proceedings. In particular, we note that his report, like Dr. Guberman's report, does not discuss the findings and treatment goals contained in the **pre-injury** records from McKinney Family Chiropractic. In fact, Dr. Mukkumala's report does not even list the **pre-injury** records from McKinney as material he reviewed, although he did indicate that he reviewed the McKinney records for the period **following** Mr. Duff's compensable injury.

however, the amount of impairment associated with a preexisting condition will vary depending on how much is awarded for the PPD. Consequently, the more seriously injured a person is by a compensable injury, the more impairment will be attributed to preexisting conditions. Although we recognize this potential issue, and find it to be a legitimate concern, the evidence presented in this case provides reasonable support for the apportionment under review, given the history of frequent treatments for Mr. Duff's preexisting back problems and the treatment goal of increasing his range of motion by a full 50%.

This Court does find that Mr. Duff makes a good point that Dr. Mukkamala's apportionment method of assigning roughly equal shares to preexisting conditions and the compensable injury might, in some instances, be considered arbitrary. However, in this case, the Board was not clearly wrong when it adopted Dr. Mukkamala's recommendation based on all the information before it. The record before this Court indicates that Mr. Duff had a long history of lumbar treatment prior to the date of injury. Dr. McKinney performed chiropractic manipulations to Mr. Duff's spine, and diagnosed him with lumbar radiculopathy. The chiropractic records indicated on numerous occasions prior to the compensable injury that Mr. Duff's condition was complicated by degenerative disc disease and that the treatment goals for him included decreasing pain and restoring range of motion. In other words, Dr. McKinney's medical records are competent medical evidence substantiating Dr. Mukkamala's medical opinion.

21

Considering the evidence of record, we cannot say the Board was clearly wrong in finding that a preexisting condition was responsible for some portion of Mr. Duff's impairment, or in upholding a roughly equal apportionment of impairment between preexisting conditions and the compensable injury involved in this case.

**D. Recommendations for Future Evaluations**

Examining physicians play a critical role in the workers' compensation process when it comes to determining permanent impairment. As noted in W. Va. Code R. 85-20-3.10 (2006), " 'Permanent impairment' means a permanent alteration of an individual's health status and is assessed by medical means and is a medical issue." The AMA Guides recognize the importance of proper reporting by physicians, stating that: "Attention to full and complete reporting will provide the best opportunity for physicians to explain the health status of patients and the nature of their impairments to reviewers, claims examiners, and hearing officials; for attorneys to understand impairments; and for individuals to pursue any benefits to which they are entitled." AMA, *Guides to the Evaluation of Permanent Impairment* at 10 (4th ed., 1993).

There are many kinds of information which may be considered by examining physicians in determining whether apportionment is proper, and how much impairment to apportion to preexisting conditions. Some of this information may be readily quantifiable, while other information is not, although it may still be relevant in assessing preexisting

22

impairment. In every case, the physician must use his knowledge, skill and experience in evaluating the evidence and determining what, if any weight, to assign it. As the AMA Guides recognize, "[a]n impairment percentage derived by means of the Guides is intended to be an **informed estimate** of the degree to which an individual's capacity to carry out activities has been diminished." AMA, *Guides to the Evaluation of Permanent Impairment* at 2 (4th ed., 1993) (emphasis added).

Although generally not sufficient in itself to establish the existence of preexisting impairments, diagnostic imaging of various kinds, such as x-rays, CT scans, and MRIs, may be valuable. Electrodiagnostic tests or range of motion studies, when available, can also be very useful. Medical records may also provide important information concerning a history of prior complaints and whether the prior condition(s) interfered with the claimant's work or other activities of daily living. The nature, frequency and duration of treatment for a preexisting condition should also be considered. Prior diagnoses or procedures may establish a percentage of impairment according to statute or the AMA Guides. In some cases, there may be prior workers' compensation awards which establish a percentage of impairment, and disability awards under other government programs such as Social Security may also be informative.

Examining physicians must examine all of the relevant information available to them and clearly identify in their reports what they have examined and

considered and how they have arrived at their conclusions regarding apportionment. "If 'apportionment' is needed, the analysis must consider the nature of the impairment and its possible relationship to each alleged factor, and it must provide an explanation of the medical basis for all conclusions and opinions." *Id.* at 10.

## IV. Conclusion

The Board's decision in this case allowing a roughly equal apportionment of impairment between the compensable injury and Mr. Duff's preexisting condition did not constitute legal error nor was it clearly wrong in view of the reliable, probative, and substantial evidence on the whole record. Accordingly, we affirm the decision of the Board affirming the award of 13% PPD to Mr. Duff as a result of his lifting injury.

Affirmed.